John A. BOEHNER, Plaintiff,

v.

James A. McDERMOTT, Defendant.

No. 98–0594(TFH).

United States District Court,
District of Columbia.

Aug. 20, 2004.

Louis K. Fisher, Michael Carvin, Jones, Day, Reavis & Pogue, Washington, DC, for Plaintiff.

Edwin John U., Eugene Frank Assaf, Jr., Frank Cicero, Jr., Kirland & Ellis, Chicago, IL, for Defendant.

### MEMORANDUM OPINION

THOMAS F. HOGAN, Chief Judge.

Pending before the Court are Plaintiff and Defendant's cross motions for summary judgment. Because both motions relate to the same set of facts and issues,

the Court will rule on both motions simultaneously. Upon careful review of both motions, oppositions, replies thereto, and the entire record herein, the Court will grant Defendant's motion in part and deny the motion in part, and the Court will grant in part and deny in part Plaintiff's motion.[1]

## I. BACKGROUND

This case results from a disclosure made by Defendant James McDermott to members of the press concerning an illegal intercept of a conference call between Plaintiff John Boehner and several House Republican leaders. McDermott is a Democratic member of the House of Representatives, representing the Seventh District of Washington, and Boehner is a Republican member of the House of Representatives, representing the Eighth District of Ohio. The subject of the conversation was a discussion of potential responses to the House Ethics Committee Probe of then-House Speaker Newt Gingrich. Boehner Dep. at 15–16.

Boehner participated in the conference call on a cellular phone inside his car while parked at a Waffle House restaurant in northern Florida. Boehner Dep. at 9. The conference call was electronically intercepted by a Florida couple, Alice and John Martin, using a radio scanner. Def.'s Ans. ¶ 8. The Martins recorded the call and then delivered that tape to the Gainesville, Florida office of Democratic Representative Karen Thurman, who at the time represented the Fifth District of Florida. See id. ¶ 10. Representative Thurman advised the Martins to deliver the tape to Defendant, who was then a ranking Democratic member of the House Committee on Standards of Official Conduct ("House Ethics Committee"). See Cover letter of 1/8/1997 that the Martins presented to Defendant along with the tape (hereinafter "Cover Letter") (found at Pl.'s Statement of Undisputed Facts ("SUF") Ex. B–8).

On January 8, 1997, the Martins personally delivered a copy of the tape enclosed in an envelope to McDermott in the anteroom of the House Ethics Committee (the "Committee") in Washington, D.C. McDermott Dep. at 157–58. Along with the tape was a letter explaining that the tape contained "a conference call heard over a scanner," and that "[the Martins] understand that [the Martins] will be granted immunity." Pl.'s SUF Ex. B–8 (Cover Letter). Before this encounter, McDermott claims to have had no knowledge of either the Martins or the tape. See McDermott Decl. ¶ 3 (found at Def.'s Opp'n Ex. F). McDermott later that evening returned to his office, opened the envelope, and listened to the tape. McDermott Dep. at 162. He maintains, however, that he has no recollection of seeing the accompanying letter at any time prior to his disclosure. Id. at 150.

That evening and the following day, McDermott disclosed the tape to the *New York Times* and the *Atlanta Journal–Constitution.* Id. at 174–75. The *New York Times* published a story regarding the contents of the disclosed tape on the front page of its January 10, 1997 edition. Adam Clymer, *Gingrich is Heard Urging Tactics in Ethics Case,* N.Y. Times, Jan. 10, 1997, at A1 (found at Pl.'s SUF Ex. B–2). The article references only an anony-

---

1. While Plaintiff indicated that he was willing to forego oral arguments, *see* Notice of Supplemental Authority at 2, Defendant "would welcome oral argument." Response to Notice of Supplemental Authority at 2. Pursuant to Local Civil Rule 7(f), the Court exercises its discretion and declines to schedule oral arguments on these motions. The pleadings submitted are very thorough, well-written, and detailed, and oral arguments would only serve to delay this case.

mous Congressional source, but McDermott acknowledges that he was the source. McDermott Dep. at 220–21. At a press conference on January 13, 1997, the Martins declared that they were responsible for intercepting Plaintiff's conversation and identified McDermott as the person to whom they delivered a copy of the conversation. Def.'s Ans. ¶ 24. Only after the Martins' press conference did McDermott deliver copies of the conversation to other members of the House Ethics Committee. Id. ¶ 25. McDermott resigned from the committee the same day. Id.

## II. PROCEDURAL HISTORY

Plaintiff filed a complaint on March 9, 1998 alleging that Defendant knowingly disclosed an unlawfully intercepted communication in violation of federal wiretapping statute, 18 U.S.C. § 2511(1)(c)[2], and a Florida wiretapping statute, Fla. Stat. § 934.03(1)(c).[3] Plaintiff seeks recovery for damages under 18 U.S.C. § 2520 and Fla. Stat. § 934.10 that authorize private actions to recover for violations of the federal and state wiretapping statutes, respectively. This Court granted Defendant's motion to dismiss, finding that the First Amendment protected the disclosure of lawfully obtained information. *Boehner v. McDermott*, No. CIV. 98–594, 1998 WL 436897, *7 (D.D.C. July 28, 1998), *rev'd*, 191 F.3d 463 (D.C.Cir.1999). The United States Court of Appeals for the District of Columbia reversed this Court by distinguishing McDermott's conduct from the controlling precedent in *Florida Star v. B.J.F.*, 491 U.S. 524, 533, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989) ("If a newspaper lawfully obtains truthful information about a matter of public significance, then [the government] may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order.") (quoting *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 103, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979)). *See Boehner v. McDermott*, 191 F.3d 463, 470–76 (D.C.Cir.1999), *vacated by* 532 U.S. 1050, 121 S.Ct. 2190, 149 L.Ed.2d 1022 (2001). The Court of Appeals found that the federal and state wiretapping statutes were not unconstitutional as applied to McDermott. 191 F.3d at 478. The Supreme Court granted certiorari, vacated the judgment of the Court of Appeals, and remanded the case in light of its decision in *Bartnicki v. Vopper*, 532 U.S. 514, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001). *McDermott v. Boehner*, 532 U.S. 1050, 121 S.Ct. 2190, 149 L.Ed.2d 1022 (2001). Finally, on remand from the Supreme Court, the Court of Appeals reversed this Court's dismissal of the case and remanded, stating "[w]e also conclude that we would benefit from having the district court pass upon the arguments that have taken on new-found importance after *Bartnicki*." *Boehner v. McDermott*, 22 Fed.Appx. 16, 2001 WL 1699420 (D.C.Cir.2001).

Plaintiff filed the instant motion for summary judgment on Dec. 16, 2002. In

---

**2.** 18 U.S.C. § 2511 provides, in pertinent part, that

(1) Except as otherwise specifically provided in this chapter any person who—

. . . . .

(c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

. . . . .

shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

**3.** Fla. Stat. § 934.03(1)(c) provides substantively identical language as 18 U.S.C. § 2511(1)(c).

that motion, Plaintiff claims that Defendant's knowledge that the tape was illegally intercepted and his subsequent disclosure of the tape to members of the press "triggers liability for both statutory and punitive damages." Pl.'s Mot. at 5. Defendant also filed a motion for summary judgment on Dec. 16, 2002, asserting that because the facts in the instant case are indistinguishable from *Bartnicki,* his disclosure was protected by the First Amendment. Def.'s Mot. at 12–13. Defendant also claims that the Florida statute does not apply to a disclosure that occurred entirely outside of Florida. *Id.* at 12.

## III. MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (stating that a court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). A material fact is one that "might affect the outcome of the suit under the governing law ...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). There is a genuine issue of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In reviewing a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inference are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505. However, "[o]nly disputes over facts that might affect the outcome of the suit

under governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. 2505. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ...." *Id.* at 255, 106 S.Ct. 2505. Therefore, a trial court should use caution when granting summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." *Id.*

Building on *Anderson,* our Court of Appeals stated that

> [i]n deciding whether there is a genuine issue of fact before it, the court must assume the truth of all statements proffered by the party opposing summary judgment—subject to an exception [that some statements are so conclusory as to come within an exception to that rule]. This is the standard even when the court entertains grave doubts about such a statement; like the weighing of evidence generally, the task of determining the credibility of a witness is the exclusive domain of the finder of fact.

*Greene v. Dalton,* 164 F.3d 671, 674 (D.C.Cir.1999) (citations omitted).

## IV. DISCUSSION

### A. Applicability of the Florida Statute

Florida Statute § 934.03 provides language substantively identical to 18 U.S.C. § 2511, under which Plaintiff also seeks recovery, as well as to the analogous D.C.Code § 23–542. The Court, however, must assess the applicability of Florida law to the facts of this case, most of which occurred in the District of Columbia.

■ The locations of the events of this case are not in dispute. Plaintiff participated in a cell phone conversation in Florida that the Martins electronically inter-

cepted in Florida. Boehner Dep. at 9; Def.'s Ans. ¶ 8. The Martins then traveled to the District of Columbia and delivered a copy of the recording to Defendant there. McDermott Dep. at 157–63. Defendant accepted materials from the Martins in the District of Columbia and subsequently disclosed that information to the media in the District of Columbia. *Id.* at 157–63, 174–75. Based on these events, Plaintiff claims that Defendant violated Florida Stat. § 934.03(c), which prohibits disclosure of unlawfully intercepted communications. Pl.'s Mot. at 9.

Defendant argues based on two separate grounds that the Florida wiretapping statute does not apply to Defendant's disclosure in the District of Columbia. First, Defendant argues that Plaintiff has not established the Florida forum contacts constitutionally required under the Due Process and the Full Faith and Credit clauses. Def.'s Mot. at 23–25. Second, Defendant maintains that even if Florida law may be constitutionally applied in this case, Florida's strong presumption against extraterritorial application of its law prevents this Court from so extending the Florida statute. *Id.* at 21–23.

██ The due process and the full faith and credit clauses of the Constitution require that, in order to apply a state's law in a given case, the state "must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 312–13, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981). Plaintiff first attempts to circumvent this constitutional requirement by demonstrating similarity between Florida wiretapping statute and the D.C. code wiretap provisions. Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n") at 18. Where an extraterritorial statute demonstrates no

material conflict with locally applicable law, Plaintiff argues, there can be no "injury" and thus no constitutional issue raised by applying the extraterritorial statute. *Id.* Plaintiff draws this principle from *Phillips Petroleum Co. v. Shutts* in which the Supreme Court reviewed a state court's application of local law in favor of the law of fora more closely tied to the events of the case. 472 U.S. 797, 818, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985).

Here, however, because Plaintiff failed to state a claim under the applicable D.C.Code provision, there is no selection to be made between Florida and District of Columbia. Extending the reasoning in *Phillips* to permit the application of Florida law in this case merely because of its similarity to the D.C. code would necessarily subject Defendant to claims under the laws of any state that evince sufficient similarity to the D.C.Code. Such reasoning is plainly incorrect and in direct opposition to the minimum contacts requirement established in *Allstate.*

Plaintiff fails to establish sufficient contacts between the events of this case and the state of Florida to constitutionally permit the application of Florida law. Plaintiff cites Defendant's testimony that "they [the Martins] told me they were in North Florida." Pl.'s Opp'n at 18 n. 16 (citing Pl.'s SUF Ex. A, McDermott Dep. 158:11–12). Such incidental contact, however, is insufficient to demonstrate the "significant" Florida contact required. Rather, Plaintiff must show that Defendant "voluntarily and purposefully availed himself of the protection of the forum state's laws." *Richter v. Analex Corp.,* 940 F.Supp. 353, 359 (D.D.C.1996) (quoting *Reiman v. First Union Real Estate Equity & Mortgage Investments,* 614 F.Supp. 255, 257 (D.D.C. 1985)); *see also American Charities for Reasonable Fundraising Regulation, Inc. v. Pinellas County,* 221 F.3d 1211, 1216

(11th Cir.2000) (requiring that a party perform some act by which it purposefully avails itself of forum law in order for that law to apply). Even if injuries incidentally flowed to parties in Florida as a result of Defendant's acts in the District of Columbia, that fails to demonstrate that Defendant purposefully availed himself of Florida law.

Plaintiff further alleges Florida contacts based on the reasoning that the state of Florida has suffered the adverse effects of "chilling" private speech due to Defendant's alleged violation. Pl.'s Opp'n at 17 (citing *Envtl. Def. Fund, Inc. v. Massey*, 986 F.2d 528, 531 (D.C.Cir.1993) (indicating that applying the law of the forum in which "adverse effects" are suffered is one of three scenarios that defeat a presumption against extraterritorial application of statutes)). *Massey*, however, dealt not with the issue of applying one state's law to another United States judicial forum, but instead with the issue of applying United States law to foreign matters. That holding does not directly address the Full Faith and Credit or the Due Process Clause requirements set forth in *Allstate*. Further, it is difficult to perceive how Defendant's actions in the District of Columbia would inflict any more severe a chilling effect on Florida than on any other state merely because the intercepted conversation originally occurred in Florida.

 Even if Florida law could constitutionally apply in this case, Florida's strong presumption against extraterritorial application of its law prohibits its application in this case. Florida courts have consistently declined to apply Florida law outside territorial boundaries unless a statute contains an "express intention that its provisions are to be given extraterritorial effect." *Burns v. Rozen*, 201 So.2d 629, 630 (Fla. 1st DCA 1967); *see also Southeastern Fisheries Ass'n, Inc. v. Dep't of Natural Res.*, 453 So.2d 1351, 1355 (Fla.1984) (declining to extend law extraterritorially absent express intent of the legislature to do so). Plaintiff's reliance on *Massey* to avoid this problem is again misplaced here as that case does not address Florida's application of Florida law to other states but rather the application of United States law to foreign matters. Thus, even if constitutionally permissible, this Court cannot contravene the Florida courts' requirement of expressed legislative intent to apply its law extraterritorially.

Therefore, Defendant is entitled to summary judgment regarding Fla. Stat. §§ 934.03, 934.10 because Defendant did not avail himself of the protection of Florida law and because the Florida statute does not apply extraterritorially.

## B. Significance of the Vacated Court of Appeals Decision

As discussed earlier, this case first came before the Court of Appeals for the District of Columbia on an appeal from this Court's granting of Defendant's original motion to dismiss. *Boehner*, 191 F.3d at 466. The Court of Appeals reversed this Court's ruling and denied Defendant's motion to dismiss. *Id.* at 478. Defendant appealed, and subsequently the Supreme Court issued an order granting certiorari, vacating the judgment of the Court of Appeals, and remanding the case (the "GVR" order) for further consideration in light of its recent decision in *Bartnicki*. 532 U.S. 1050, 121 S.Ct. 2190 (2001). The Court of Appeals, in turn, reversed the judgment of this Court, remanded the case, and allowed Plaintiff to file an amended complaint. 22 Fed.Appx. at 17. The parties now dispute the significance, if any, of the vacated Court of Appeals judgment.

 As a preliminary matter, because the ruling by the Court of Appeals came

on a motion to dismiss, that court was constrained to "take as true the allegations made by [Plaintiff] in his complaint." *Boehner*, 191 F.3d 463, 464 n. 1. On motions for summary judgment, this Court accepts all evidence in favor of the non-moving party and is not bound by the factual assertions accepted by the Court of Appeals. Defendant is correct in asserting that a general order of the Supreme Court vacating the judgment of the Court of Appeals "deprives [the Court of Appeals's] opinion of precedential effect." *Los Angeles County v. Davis*, 440 U.S. 625, 634 n. 6, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (quoting *O'Connor v. Donaldson*, 422 U.S. 563, 577–78 n. 12, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975)). The Supreme Court's GVR order in this case, however, was not a general vacation but rather a specific order vacating the Court of Appeals' judgment and remanding for further consideration in light of the Supreme Court's decision in *Bartnicki*. *Boehner*, 532 U.S. 1050, 121 S.Ct. 2190. Such a GVR order that directs reconsideration in light of a new Supreme Court decision "is of a much more limited nature" than a general vacation. *United States v. M.C.C. of Florida, Inc.*, 967 F.2d 1559, 1562 (11th Cir.1992) (determining that a GVR order issued by the Supreme Court instructing further consideration in light of a recent decision did not "nullify all prior proceedings"). Further, "[v]acatur and remand by the Supreme Court ... does not create an implication that the lower court should change its prior determination." *Hughes Aircraft Co. v. United States*, 140 F.3d 1470, 1473 (Fed.Cir.1998).

> Additionally,
> [a]lthough a decision vacating a judgment necessarily prevents the opinion of the lower court from being the law of the case, the expressions of the court below on the merits, if not reversed, will continue to have precedential weight and, until contrary authority is decided, are likely to be viewed as persuasive authority if not the governing law of the ... Circuit.

*Kurtz v. Baker*, 644 F.Supp. 613, 621 (D.D.C.1986) (citing *Davis*, 440 U.S. at 646 n. 10, 99 S.Ct. 1379 (Powell, J., dissenting)). Although no longer the law of the case, a vacated opinion may serve as a valuable source of guidance on the legal issues raised in the absence of contrary authority. *Christianson v. Colt Indus. Operating Corp.*, 870 F.2d 1292, 1298 (7th Cir.1989) (holding that an opinion vacated on jurisdictional grounds "stands as the most comprehensive source of guidance available on the ... questions at issue in this case"). Moreover, "where [a] circuit court decision is vacated for reconsideration, rulings on unrelated issues continue to have precedential effect." *Metro. Wash. Airports Auth. Prof'l Fire Fighters Ass'n Local 3217 v. United States*, 959 F.2d 297, 304–05 (D.C.Cir.1992) (paraphrasing the D.C. Circuit rule regarding vacated opinions established in *Action Alliance of Senior Citizens v. Sullivan*, 930 F.2d 77, 83–84 (D.C.Cir.1991)); *see also Edmond v. U.S.P.S. Gen. Counsel*, 949 F.2d 415, 424 n. 17 (D.C.Cir.1991) ("Indeed, this circuit has more than once cited [a particular vacated opinion] as authority for legal propositions that were not disturbed by the decision on rehearing.").

Consequently, while Defendant accurately asserts that the vacated Court of Appeals decision does not strictly bind this Court, prudence counsels against wholly disregarding the residual authority of the vacated opinion. The Court of Appeals's reverse and remand order clarified the scope of this Court's current task. In that order, the Court of Appeals indicated it would benefit from this Court "pass[ing] upon the arguments that have taken on new-found importance after *Bartnicki*." *Boehner*, 22 Fed.Appx. at 17. The Court

of Appeals also indicated that "the constitutional issues now raised may more readily be decided if [Plaintiff] is given an opportunity to amend his complaint." *Id.* The scope of this Court's task on remand is thus clear. In its determination of summary judgment, this Court will take into account Plaintiff and Defendant's amended arguments, the new evidence submitted, and the entire record herein. Further, the Court will assess these arguments in light of all existing authority, including the Court of Appeals's vacated opinion and the Supreme Court's decision in *Bartnicki.*

## C. The Scope of First Amendment Protection

At issue throughout this ongoing litigation has been the scope of protection afforded by the First Amendment as it applies to Defendant in this case. To refine the First Amendment issue presented, it is helpful to characterize with particularity the events giving rise to the instant dispute. First, it is undisputed that the Martins' initial act in recording Plaintiff's conference telephone conversation on December 21, 1996 violated 18 U.S.C. § 2511(1)(a), prohibiting the intentional intercept of electronic communications. Def.'s Ans. ¶¶ 8, 30. The Martins were charged with and pleaded guilty to this offense on April 25, 1997, and were each fined $500. Def.'s Opp'n Ex. T (DOJ Press Release Regarding Martins' Sentencing). Second, it is undisputed that the Martins disclosed the recording to McDermott on January 8, 1997. McDermott Dep. at 157–63. Both the Court of Appeals and this Court noted that by this disclosure of unlawfully obtained material the Martins likely violated 18 U.S.C. § 2511 again, although they were not charged with that separate offense. *Boehner,* 191 F.3d at 475–76 (concluding that "[t]he Martins violated § 2511 not once, but twice—first when they intercept-

ed the call and second when they disclosed it to McDermott"); *Boehner,* 1998 WL 436897, at *4 (noting that "the wiretap statutes prohibit the Martins' interception, and the Martins' disclosure of the tape"). The third significant event leading to the ultimate public disclosure of the tape was McDermott's receipt and retention of the tape and cover letter from the Martins. As will be addressed in subsequent analysis, the parties dispute the lawfulness of this third event. Fourth and finally, the parties do not dispute that on the evening of January 8, 1997, McDermott disclosed the material he received from the Martins to the press. McDermott Dep. at 183.

■ As a preliminary matter, the Court finds that by the time Defendant disclosed the tape to the media, he knew or had reason to know that the tape had been obtained through the unlawful interception of communications. Upon discovering that the tape presented by the Martins, two private citizens from Florida, contained a recorded telephone conversation among several high level government representatives, Defendant would have every reason to realize that the conversation had been illegally intercepted. Defendant concedes that he drew a similar conclusion upon listening to the tape, stating that "I had a CB radio in my car and I used to listen to people's conversations all the time. So I could imagine that that might have been how [the recording] happened.... [T]hat's kind of what I thought when I heard it." McDermott Dep. at 181. Further, Defendant acknowledges that he did not believe the Martins had been invited participants in the call. *Id.* at 182–183. Finally, it is undisputed that, after listening to the tape, Defendant proceeded to intentionally disclose the contents of the tape to several members of the media, including Adam Clymer of the *New York Times* on Janu-

ary 8, 1997. *Id.* at 183, 186–87. As a result, the Court finds that Defendant violated 18 U.S.C. § 2511(1)(c).

▇ In *Bartnicki*, the Supreme Court held that where information of public importance is illegally intercepted, 18 U.S.C. § 2511(1)(c) is unconstitutional as applied to a third party who lawfully receives the intercepted information and discloses it to the media. 532 U.S. at 535, 121 S.Ct. 1753 (stating that "a stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern"). In light of *Bartnicki*, the issue now squarely before this Court is whether 18 U.S.C. § 2511(1)(c) is unconstitutional under the First Amendment as applied to Defendant in this case. Put another way, the issue is whether the First Amendment shields Defendant's disclosure from liability under the applicable wiretapping statutes.

Like this case, *Bartnicki* also involved information initially obtained in violation of 18 U.S.C. § 2511 and subsequently disclosed by a third party. In *Bartnicki*, a radio commentator and several other media defendants published information from a tape which contained an illegally intercepted cell phone conversation between the petitioners. *Bartnicki*, 532 U.S. at 518, 121 S.Ct. 1753. The *Bartnicki* petitioners were at the time involved in contentious negotiations between a union representing teachers and a local school board, and in their intercepted conversation they made several comments apparently threatening physical harm in regard to the negotiations. *Id.* at 518–19, 121

S.Ct. 1753. The tape was discovered by respondent Yocum in his mailbox, and the source of the tape was never identified. *Id.* at 518–19, 121 S.Ct. 1753.

Due to the procedural posture of *Bartnicki*, the Supreme Court "accept[ed] respondents' submission on three factual matters that serve to distinguish most of the cases that have arisen under § 2511." *Id.* at 525, 121 S.Ct. 1753. Specifically, the Supreme Court accepted that the respondents played no part in the illegal interception, that their access to the information was obtained lawfully, and that the conversations dealt with a matter of public concern. *Id.* The Supreme Court noted that, despite obtaining the material lawfully themselves, respondents at minimum had "reason to know" the original interception was unlawful presumably by the time of their respective disclosures.[4] *Id.* The Supreme Court stated that the case "present[ed] a conflict between interests of the highest order—on the one hand, the interest in the full and free dissemination of information concerning public issues, and, on the other hand, the interest in individual privacy and, more specifically, in fostering private speech." *Id.* at 518, 121 S.Ct. 1753. Ultimately, the Supreme Court held that such disclosures were protected by the First Amendment because "[i]n these cases, privacy concerns give way when balanced against the interest in publishing matters of public importance." *Id.* at 534, 121 S.Ct. 1753. The Supreme Court concluded "that a stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a

---

4. While not specifying at what point it charged the respondents in *Bartnicki* with "reason to know" of the illegality of the original interception, *see Bartnicki*, 532 U.S. at 524–25, 121 S.Ct. 1753, the Supreme Court noted respondent Yocum's testimony that he initially discovered only a tape anonymously placed in his mailbox and that he "recognized

the voices of Barnicki and Kane." *Id.* at 519, 121 S.Ct. 1753. The Supreme Court thus presumably charged Yocum with knowledge of the illegality of the original interception at some point after receiving and listening to the tape but prior to disclosing it. *Id.* at 525, 121 S.Ct. 1753.

matter of public concern." *Id.* at 535, 121 S.Ct. 1753.

In reaching this conclusion, however, the Supreme Court noted that its "holding, of course, does not apply to punishing parties for obtaining the relevant information unlawfully." *Id.* at 532 n. 19, 121 S.Ct. 1753. In his concurring opinion, Justice Breyer addressed the lawfulness of the third party in obtaining the information. He stated that "[n]o one claims that [the media respondents] ordered, counseled, encouraged, or otherwise aided or abetted the interception, the later delivery of the tape by the interceptor to an intermediary, or the tape's still later delivery by the intermediary to the media." *Id.* at 538, 121 S.Ct. 1753 (Breyer, J., concurring). Justice Breyer agreed with the majority's holding, but he "would not extend th[e] holding beyond [the] present circumstances." *Id.* at 541, 121 S.Ct. 1753 (Breyer, J., concurring).

Defendant asserts that this case is indistinguishable from *Bartnicki.* Plaintiff, however, raises three separate grounds which, if valid, would serve to distinguish this case from *Bartnicki:* (1) whether, in light of *United States v. Aguilar,* 515 U.S. 593, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995), Defendant's disclosure violated special duties imposed on him as then-ranking member of the House Ethics Committee, (2) whether Defendant's receipt of the tape from the Martins was so closely tied by knowledge and action to the Martins's illegal disclosure that Defendant obtained the information unlawfully, and (3) 18 U.S.C. § 2511(1)(c) would survive First Amendment scrutiny even if *Bartnicki* fully applied, because the statute is constitutional under the fact-specific balancing test set forth in that opinion.[5]

### 1. Defendant's Status as Then–Ranking Member of the House Ethics Committee

Plaintiff contends that, unlike in *Bartnicki,* finding Defendant liable for violating § 2511(1)(c) survives a First Amendment test here because Defendant's disclosure is governed by the Supreme Court's decision in *United States v. Aguilar,* 515 U.S. 593, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995). *Aguilar* held that disclosures by certain public officials are not protected by the same stringent First Amendment scrutiny as disclosures by ordinary citizens. *Id.* at 606, 115 S.Ct. 2357. In *Aguilar,* a federal judge disclosed information about the existence of a wiretap to the subject of the surveillance, thus violating a federal law. *Id.* His conviction was affirmed under a diminished standard of First Amendment scrutiny because the Supreme Court held that he voluntarily assumed a duty of confidentiality with regard to the information he disclosed. *Id.*

Plaintiff argues that *Aguilar* is indistinguishable from the instant case because the House Ethics Committee Rules (the "Committee Rules") regarding disclosures[6] justify applying a lower standard of

---

**5.** As described below, the Court finds that Defendant unlawfully obtained the information on the tape, and therefore the facts of the instant case set it apart from *Bartnicki.* For this reason, the Court does not find it necessary to address the merits of Plaintiff's third argument (i.e., even if *Bartnicki* fully applied, the statute is constitutional under the fact-specific balancing test set forth in that opinion). The Court will address, however, Plaintiff's *Aguilar* argument, as it raises important issues that are worthy of discussion on the merits.

**6.** The Rules of the Committee on Standards of Official Conduct 10(b) [entitled "Committee Records"] (now Rule 12(b)) states: "Members and staff of the Committee shall not disclose to any person or organization outside the Committee, unless authorized by the Committee, any information regarding the Committee's or a subcommittee's investigative, adju-

First Amendment Protection to Defendant's disclosure. To the contrary, Defendant insists that he must be afforded the same First Amendment protection as any other public citizen because he did not receive the information in his official capacity as a member of the Committee, and that his disclosure was not governed by a pre-existing duty not to disclose similar to that in *Aguilar*. As explained below, McDermott's argument fails as to his point regarding how and why he received the information, but his argument succeeds as to whether he was under a preexisting duty greater than that required of any citizen.

**(a) Whether McDermott Received the Information In His Official Capacity As A Member of the Committee**

Defendant argues that

[b]ecause [he] did not receive the information on the tape from a fellow Committee member, as part of a Committee briefing, or from a witness in a closed Committee hearing, and because lawfully could have received the tape even if he were not a member of Congress, *Aguilar* cannot be used to contradict what *Bartnicki* commands.

Def.'s Reply at 9. Specifically, McDermott artfully pleads that he did not "obtain[ ] the information in his official capacity as a member of the Ethics Committee. Instead, ... he received it from private citizens, not from (or through) the Committee.... [He] obtained the information from the Martins in his 'unofficial political capacity,' rather than his 'official ethical capacity.'" Def.'s Mot. at 18–19 (internal citations to *Boehner*, 191 F.3d at 486 (Sentelle, J., dissenting)). Such are Defendant's arguments to the Court; however, the cover letter itself and the documents produced by McDermott in discovery show

a different version of events. First, the cover letter reads as follows:

January 8, 1997

Committee On Standards of Official Conduct

HT2 Capital

20515–6328

Jim McDermott, Ranking Member

Enclosed in the envelope you will find a tape of a conversation heard December 21, 1996 at about 9:45 a.m. The call was a conference call heard over a scanner. We felt the information included were [sic] of importance to the committee. We live in the 5th. Congressional District and attempted to give the tape to Congresswoman Karen Thurman. We were advised by her to turn the tape directly over to you. We also understand that we will be granted immunity. ... We pray that committee [sic] will consider our sincerity in placing it in your hands.

We will return to our home today.

Thank you for your consideration.

John and Alice Martin

[Address and phone number omitted herein.]

Cover Letter (found at Pl.'s SUF Ex. B–8). Based on the plain text of the cover letter, it is undisputed that the Martins were told to and did seek out McDermott because he was Ranking Member of the House Ethics Committee and because the information on the tape pertained to that Committee's pending investigation of Newt Gingrich.

Second, McDermott, and others acting on his behalf, have solicited funds from people in McDermott's district and elsewhere in order to pay for the legal fees incurred as a result of the instant litiga-

---

dicatory or other proceedings ...." Pl.'s SUF Ex. B–7 ("Rules Adopted by the Committee of

the House of Representatives (104th Congress, 1995–1996")).

tion. The materials sent out as part of this fundraising campaign show that McDermott himself believes he was acting in his official capacity as a member of the Ethics Committee. The following examples demonstrate this, and are numbered as they appear in Exhibit L of Plaintiff's Undisputed Facts:

— Ex. L; M000001 (Fundraising Letter from Def., dated 12/14/2000):

In 1993, when Speaker Tom Foley asked me to chair the House Ethics Committee, I could not have envisioned that six years later, I would be writing this letter to you. But I fell heir to chairing the Committee when it undertook consideration of the Newt Gingrich case.

As that case proceeded, I was sued in federal court by John Boehner....

Throughout this protracted process, my position has rested upon the protections afforded all Americans by the First Amendment. The effort has been extremely costly, and I now find myself in need of your help....

To meet this obligation, I have established the Jim McDermott Legal Expense Trust ....

— Ex. L; M000003 (Fundraising Letter from Thomas S. Foley, dated 06/19/2001):

"Jim McDermott has been targeted and attacked [in this lawsuit] by Republicans because of his work on the Ethics Committee."

— Ex. L; M000005 (Fundraising Letter from Andrew L. Stern, International President of Service Employees International Union, dated 08/13/2001):

"Jim [McDermott] was sued in federal court by Congressman John Boehner (R–OH) because of his role in the investigation that led to then-Speaker Newt Gingrich's resignation from Congress."

— Ex. L; M000006 (Fundraising Letter from Def., dated 02/08/2001):

"Thank you for your offer to assist my Legal Expense Trust. The Congress allows it members to establish such trusts to pay legal expenses incurred in connection with official duties or a position in Congress."

— Ex. L; M000027 (Fundraising Letter from Richard A. Gephardt, dated 09/06/2001):

"As a result of performing his duties, [Jim McDermott] has found himself faced with onerous legal expenses in the defense of our First Amendment rights."

— Ex. L; M000035 (Fundraising Solicitation from "Friends for Jim McDermott," undated):

"The Jim McDermott Legal Expense Trust has been created exclusively to defray legal costs that have been and will be incurred in connection with Congressman McDermott's official duties and position in Congress."

These documents could not make it more clear that Defendant believes he was acting in his official capacity as a member of the Ethics Committee. In 1999, Judge Sentelle wrote the following:

Appellant and intervenor argue that McDermott can be punished for his disclosure because of his having, in their view, obtained the information at issue in his capacity as a member of the House Ethics Committee. I cannot agree. McDermott did not in fact obtain the information in his official capacity. The felons who communicated it to him were not looking for him to use his official ethical capacity but rather his unofficial political capacity to disseminate their unlawfully obtained information. It may well be the case that had

he obtained the same information, for example, by Committee subpoena, he could not have lawfully disclosed it and his disclosure would not be constitutionally protected. Indeed, that is perhaps more likely than not. But those are not the facts before us.

*Boehner v. McDermott*, 191 F.3d at 485–86 (Sentelle, J., dissenting). Judge Sentelle reached this conclusion, however, without the benefit of the above information that was obtained through discovery. Through his own fundraising materials, McDermott has admitted that he believes otherwise. In this light, and based on the plain text of the cover letter, Defendant's argument that he received the tape from the Martins in his "unofficial political capacity" is without merit.

### (b) Whether McDermott Was Under A Pre-existing Duty Not to Disclose

While it is not for the courts to interpret or enforce Congressional rules, Plaintiff argues that *United States v. Rostenkowski*, 59 F.3d 1291 (D.C.Cir.1995), permits this Court to take limited judicial cognizance of the Committee Rules to the extent of determining whether Defendant's disclosure violated any special duty similar to that found in *Aguilar*. Pl.'s Mot. at 15 n. 11. To support the alleged rule violation, Plaintiff emphasizes Defendant's admission [through counsel] that he was given the tape because of his position as a ranking member of the House Committee. Pl.'s Opp'n at 9–10 (citing Pl.'s SUF Ex. I, July 17, 1998 Hrg. Tr. at 22:10–11; 15:21–16:5; 24:3). *Rostenkowski* permits the courts to take limited judicial cognizance of the rules of Congress; however, it also makes clear that it is outside the realm of the courts to construe Congressional rules that present significant ambiguities. 59 F.3d at 1312 (holding that where there is "reasonable doubt" as to the application of a Congressional rule, the court "cannot presume to interpret it"). In the case at hand, a significant ambiguity exists as to whether the Committee's non-disclosure rule (i.e., the former Rule 10(b)) applies to unsolicited, illegal information presented outside the Committee by private citizens. Further, the contents of the tape in which both members of Congress and nonmembers privately discuss political responses to a Committee ruling may or may not be "information regarding the Committee's ... proceedings" within the meaning of the Committee Rule. While the Court has found that the Martins did present their recording to Defendant due to his position on the Committee, it is not apparent that the Martins' decision in that regard materially affects whether the information falls within the scope contemplated by the Committee Rules.

Further, Congress altered the scope of the Ethics Committee non-disclosure rules in the wake of the events of this case by subsequently instituting an oath requiring members to swear not to disclose any information "received in the course of [one's] service with the committee." 143 Cong. Rec. H7544–02 (1997). This subsequent clarification fuels doubt as to whether the Committee Rules as written at the time of Defendant's disclosure in fact prohibited Defendant's disclosure. Overall, this Court declines to interpret the Committee Rules as they stood at the time to determine whether Defendant's actions violated any special duty of confidentiality imposed on him.

Plaintiff argues in the alternative that even if Defendant's disclosure violated no specific duty under the Committee Rules, the confidentiality duty imposed in *Aguilar* did not derive from formal rules. Plaintiff thus urges that Defendant was under a general Congressional non-disclosure duty that "goes without saying." Pl.'s Mot. at 18. The duty invoked in *Aguilar*, howev-

er, was the "universally recognized" duty of confidentiality with regard to communications between judicial colleagues concerning sensitive information. *United States v. Aguilar*, 994 F.2d 609, 616 (9th Cir.1993), *opinion withdrawn by* 21 F.3d 1475 (9th Cir.1994) (en banc), *reversed on grounds other than this point*, 515 U.S. 593, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995); *see also Aguilar*, 515 U.S. at 605–06, 115 S.Ct. 2357 (Judge Aguilar was not "simply a member of the general public who happened to lawfully acquire possession of information about the wiretap; he was a Federal District Court Judge who learned of a confidential wiretap application from the judge who had authorized the interception, and who wished to preserve the integrity of the court."). Here, by contrast, Defendant received information from members of the general public unconnected to Congress or to the Committee outside of Committee proceedings. While one would expect the Chairman of the Ethics Committee to handle such information in an ethically judicious manner, the law has not previously recognized a general Congressional duty of non-disclosure and this Court declines to create such a duty here.

**(c) Conclusion Regarding Applicability of *Aguilar* to This Case**

This Court originally held that *Aguilar* was distinguishable from the instant case since McDermott had "no such independent duty not to disclose information; the restriction on disclosure derive[d] solely from the federal and state statutes themselves." *Boehner*, 1998 WL 436897, at *6. The Court of Appeals agreed, stating that while McDermott did receive the tape under a duty not to disclose, that duty "arose from a statute— § 2511(1)(c)." *Boehner*, 191 F.3d at 477. Nothing in the vacated court of appeals opinion nor in the Supreme Court's decision in Bartnicki sug-

gests expanding the holding in *Aguilar* to apply to Defendant's disclosure. Indeed, no legal authority has since come to light that would warrant departure from that position. Therefore, while it is clear that McDermott received the information from the Martins in his official political capacity, the Court does not find that he was under an independent preexisting duty greater than that required of any citizen.

**2. The Lawfulness of the Manner In Which Defendant Obtained the Information**

██ As described above, this Court has concluded that Defendant's ultimate disclosure of the Martins' tape violated 18 U.S.C. § 2511(1)(c). The Supreme Court noted, however, that whether the First Amendment shields a defendant from liability under that statute substantially depends upon the lawfulness of the manner in which he *initially obtained* the information. *See Bartnicki*, 532 U.S. at 532 n. 19, 121 S.Ct. 1753 (noting that the First Amendment protection applied to the disclosure in that case "does not apply to punishing parties for obtaining the relevant information unlawfully"). Where a defendant unlawfully obtains information, neither *Bartnicki* nor any other authority shields against liability for subsequent disclosure.

On Defendant's earlier motion to dismiss, this Court held that Defendant had not unlawfully obtained the tape from the Martins. *Boehner*, 1998 WL 436897, at *4. The Court reasoned that Defendant could not have unlawfully obtained information because his receipt of it was not expressly prohibited by statute. *Id.* (holding that "[b]ecause defendant did not break any laws in taking possession of the tape, he lawfully obtained that information"). As a result, the Court reluctantly held that Defendant had exploited a loophole. *Id.* As a

result, the Court concluded that "neither statute nor caselaw provides substantial basis to conclude that defendant unlawfully obtained the taped conversation." *Id.*

The Court of Appeals, however, specifically found otherwise. In reaching this conclusion, the Court of Appeals assumed all facts as presented by Plaintiff. *Boehner,* 191 F.3d 463, 464 n. 1. Both the majority and the concurring Court of Appeals opinions ruled that Defendant had obtained the tape through an "illegal transaction." 191 F.3d at 475–76, 479. As a result, the majority held that "the illegal activity of the Martins, of which McDermott was well aware when he took possession of the tape," took this case outside the *Florida Star* line of cases that protects lawfully obtained information. *Id.* at 476. The court explained that "[a]gain and again [Defendant] insists that he 'lawfully obtained' the tape. By this he means that he broke no law in taking possession of the tape. But this is hardly certain. . . . By accepting the tape from the Martins, McDermott participated in their illegal conduct." *Id.* at 475–76. The concurring opinion further articulated this reasoning, stating

> [n]ot only was the transaction in which McDermott obtained the tape therefore illegal—albeit only the Martins could be punished for effectuating it—but McDermott knew the transaction was illegal at the time he entered into it. One who obtains information in an illegal transaction, with full knowledge the transaction is illegal, has not 'lawfully obtain[ed]' that information in any meaningful sense.

*Id.* at 479 (Ginsburg, J., concurring) (footnote and internal citation omitted). Overall, both the majority and the concurrence found that because the transaction in which Defendant obtained the tape was illegal and because he knew it to be so at the time he took possession, his actions and knowledge placed this case outside the *Florida Star* line of cases protecting disclosure of lawfully obtained information. Intermediate scrutiny would therefore apply. *Boehner,* 191 F.3d at 479 (Ginsburg, J., concurring) ("Because McDermott did not in fact lawfully obtain the tape, however, he may be punished under § 2511(1)(c), as he concedes, if the statute as applied to him survives intermediate scrutiny."); *id.* at 480 (Ginsburg, J., concurring) ("[I]f *Florida Star* does not require the application of strict scrutiny in this case, then we should apply at most intermediate scrutiny.")

As a result, the conclusion to be drawn from that court's opinion is that even though 18 U.S.C. § 2511 does not specifically prohibit the receipt of illegally obtained information, Defendant did not lawfully obtain the material if he knew of the illegality of the Martins' disclosure at the time he voluntarily accepted it. The Court of Appeals thus examined the scenario in which a source obtains information illegally and passes it to an intermediary, and that court found that an intermediary's present knowledge of the illegality of a source's disclosure at the time the intermediary accepts it renders the intermediary's obtaining of the information unlawful.

*Bartnicki* does not disturb that point of law because the Supreme Court merely "accept[ed] respondents' submission" in that case on the assertion that the parties had lawfully obtained access to the intercepted information in that case. 532 U.S. at 525, 121 S.Ct. 1753. The defendants' actions in *Bartnicki* did not present a knowing acceptance scenario such as is alleged here. In *Bartnicki,* the first known link in the chain of the illegally intercepted information was defendant Yocum. *Id.* at 519, 121 S.Ct. 1753. Yocum obtained the illegally intercepted informa-

tion by unwittingly retrieving an unsolicited tape anonymously placed in his mailbox. *Id.* The Supreme Court held that Yocum's subsequent disclosure of the illegally intercepted, but publicly valuable, information to defendant Vopper was therefore protected under the First Amendment. *See id.* at 534, 121 S.Ct. 1753. Inductively, then, radio commentator Vopper's receipt of the information was similarly found to be lawful and his disclosure of the information on his radio show was protected. *See id.* Identical reasoning applies to all media defendants who subsequently obtained and disclosed based on Vopper's radio account.

For purposes of this case, the *Bartnicki* ruling in relation to defendant Yocum's actions is extremely relevant. Examining Yocum's actions, *Bartnicki* necessarily stands for the proposition that a defendant who anonymously receives illegally intercepted information *without present knowledge* of its illegality has obtained it lawfully. *See* 532 U.S. at 525, 121 S.Ct. 1753. The vacated Court of Appeals opinion, by contrast, concluded that a defendant who accepts information from a source *with present knowledge* of source's identity and the illegality of the source's disclosure has himself unlawfully obtained it. *Boehner,* 191 F.3d at 476, 479.

This Court finds no conflict between those independent propositions. The Supreme Court acknowledged this differentiation but expressed no view on it, noting only that "[i]n the *Boehner* case ... the defendant knew both who was responsible for intercepting the conversation and how they had done it. In the opinion of the majority, the defendant acted unlawfully in accepting the tape in order to provide it to the media." *Bartnicki,* 532 U.S. at 522 n. 5, 121 S.Ct. 1753 (internal citation omitted). The Supreme Court further emphasized that "a stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern." *Id.* at 535, 121 S.Ct. 1753 (footnote omitted). This again distinguishes the stranger's act in *Bartnicki* with the Court of Appeals's reasoning in which a recipient knows of both the identity and the illegal means by which a source has obtained the information. Moreover, the distinction drawn creates sound policy because a recipient's present knowledge of illegality of a disclosure implicates the choice to condone it by accepting the information or to prevent it by declining to participate. In contrast, punishing a defendant who accepts an anonymous disclosure with no knowledge of the illegality of the disclosure can deter nothing. Consequently, this Court declines to depart from the reasoning in the vacated Court of Appeals opinion to the extent that it remains undisturbed by the holding in *Bartnicki.*

Summary judgment requires the Court to determine from the record before it whether undisputed facts cast this case under the Court of Appeals' reasoning or the *Bartnicki* holding, or whether facts in dispute control that determination. The primary distinction between those scenarios rests on what Defendant knew about the illegality of the information he accepted and when he knew it. In this case, the Martins supplied with their tape a cover letter that introduces themselves and explains their illegal interception. McDermott Dep. at 266; *see also* Cover Letter (Pl.'s SUF Ex. B–8). It is clear that *at some point* McDermott knew that the tape was illegally obtained. Of course, the crucial question in this case is when did he learn it and, consequently, whether he participated in the illegal conduct of the Martins. If Defendant read the cover letter or the Martins related its relevant contents to him at the time Defendant received the tape, he would have possessed sufficient knowledge of the illegal transaction to

have unlawfully obtained the tape as per the Court of Appeals's reasoning. On the other hand, if Defendant learned of the contents of the letter at some later time after taking possession of the tape, the Court of Appeals's reasoning no longer applies and the case more closely resembles *Bartnicki*, wherein

> respondents played no part in the illegal interception. Rather, they found out about the interception only after it occurred, and in fact never learned the identity of the person or persons who made the interception. Second, their access to the information on the tapes was obtained lawfully, even though the information itself was obtained unlawfully by someone else.

*Bartnicki*, 532 U.S. at 525, 121 S.Ct. 1753.

Defendant maintains only that he has no recollection of reading the cover letter prior to his disclosure of the tape and that the Martins provided no relevant information to him other than their names and the area of their home state in which they lived. McDermott Dep. at 150, 158. Not only does common sense dictate that one who accepts from strangers a package with a short accompanying letter is likely to read the letter, but—as explained below—strong evidence indicates that Defendant knew of the information contained in the letter at the time he assumed possession of the tape. Defendant counters this by asserting that the letter was actually included inside the envelope with the tape, hidden from his view at least until his later review of the materials. Def.'s Opp'n at 11. He claims that

> the letter was sealed inside the accompanying 8-1/2″ by 11″ packing envelope, making it impossible to charge McDermott with knowledge of its contents *when he received the envelope* from them. McDermott did not open the envelope until after he left the Martins, and did not notice the cover letter even then, when only the tape fell out. (McDermott Dep. at 150:14–25, 154:14–17, 164:3–5 ("I opened the envelope and dumped it out and there was a tape and put it my [tape player] and listened to it."); *see also id.* at 159:9 (describing the 8-1/2″ by 11″ packing envelope).)

*Id.* at 6 (emphasis in original). This assertion that the letter was hidden inside the envelope is totally unsupported by the record, however, and was not specifically claimed by McDermott until his attorneys stated such in Defendant's opposition to Plaintiff's motion for summary judgment. He cites no evidence demonstrating that the letter was "sealed inside" the envelope as opposed to taped to the outside of it; [7]

7. Shortly after the topic of the cover letter was raised at Defendant's deposition, a discussion ensued among counsel as to whether the cover letter Defendant turned over in discovery to Plaintiff came from Defendant's files or from some other source. *See generally* McDermott Dep. at 151–153. This distinction was meaningful, Defendant's counsel argued during the deposition, because

> [i]n our search of [Defendant's and Defendant's counsel's] records to produce to [Plaintiff] we found no copy of the letter. Otherwise we would have produced it to you from that source. But we did have a copy we had obtained from the Department of Justice as the fax line [at the top of the document] indicates and we produced that one. . . . But it didn't come from [Defendant's] files.

*Id.* at 151:19–152:1. The Court infers that this discussion occurred during the deposition to support a future assertion that Defendant never saw the cover letter, but the specific issue as to whether or not Defendant's files contained a copy of the cover letter was not raised in any of Defendant's summary judgment pleadings. The reason that DOJ had the cover letter in the first place, however, is because DOJ received it from the House Ethics Committee on January 13, 1997, which in turn received it that same day from McDermott. *See* Letter from Chief Counsel of Ethics Committee (found at Pl.'s SUF Ex. B–9).

rather, he argues that "[t]here is no basis for Boehner's assertion that because McDermott does *not* recall seeing the letter, he necessarily *must* have read it . . . ." Def.'s Opp'n at 12 n. 5. Indeed, his own deposition passages that he cites merely reiterate that he could not recall reading the cover letter.[8] None of his other filings with this Court lend support to his claim. For example, McDermott's Answer to the Complaint states that he "slit open the envelope in his office and shook out the Tape. He does not recall seeing the letter." Def.'s Answer at 7. His Declaration of December 16, 2002 does not address the cover letter. In fact, other than the unsupported assertion in his opposition, McDermott has provided no declaration, affidavit, or other evidence indicating that the cover letter was sealed inside the envelope and thus potentially out of his view.

The wording of the cover letter itself, however, indicates that the cover letter was outside the envelope. Specifically, the cover letter provides that "[e]nclosed in the envelope you will find a tape." Pl.'s SUF Ex. B–8 (Cover Letter). Additionally, the January 10, 1997 *New York Times* article published as a result of Defendant's disclosure demonstrates Defendant's knowledge of the tape's illegal origins. That article quotes Defendant as providing identical information as that contained in the letter, and even using similar phraseology. The cover letter provided that the envelope contains "a tape of a conversation heard December 21, 1996 at about 9:45 a.m. The call was a conference call heard over a scanner." *Id.* In comparison, the *New York Times* article states that

> [t]he Congressman said the tape was given to him on Wednesday by a couple who said they were from northern Florida. He quoted them as saying it had been recorded off a radio scanner, suggesting that one participant was using a cellular telephone. They said it was recorded about 9:45 a.m. on Dec. 21.

Pl.'s Ex. B–2. Defendant can explain neither the article quoting him as having knowledge of the tape's origins nor the remarkable similarity between the quotes attributed to him and the cover letter he purports not to remember reading. McDermott Dep. at 156–57.

Further, Defendant's conduct surrounding the publishing of this article also indicates that he was aware of the tape's illegal origins. By his own estimate, Defendant returned to his office and listened to the tape at approximately 7:00 p.m. on January 8, 1997. *See* McDermott Dep. at 162–64. Shortly thereafter that same night, Defendant called New York Times reporter Adam Clymer and invited him to Defendant's office to listen to the tape. *See id.* at 183–84. Clymer then wrote in the newspaper article that "a transcript [of the tape] was made available by a Democratic Congressman hostile to Mr. Gingrich who insisted that he

---

8. Defendant's deposition at 150:14–25 reads:
 [Q] Do you not recall seeing the cover letter or are you denying—do you have a recollection that there was no cover letter?
 [A] No, I can't remember. I can't remember seeing the letter.
 [Q] Okay. And just so I'm clear, you can't remember seeing it on January 8th, when you met with the Martins, correct?
 [A] Yes.
 [Q] And at any time thereafter, did you see the cover letter?

[A] I have no recollection of seeing a letter.
 Similarly, the same deposition at 154:14–19 reads as follows:
 [Q] Okay. So you don't recall seeing the cover letter at any time prior to January 13th, just so I'm clear?
 [A] Prior to January 13th.
 [Q] 1997.
 [A] No, I don't.

not be identified further." Adam Clymer, *Gingrich is Heard Urging Tactics in Ethics Case*, N.Y. Times, Jan. 10, 1997, at A1, A20 (found at Pl.'s SUF Ex. B–2). McDermott continued to deny his role in the release of the tape when he spoke with reporters on January 10, 1997. *See* McDermott Dep. at 225–26. In fact, he maintained these denials until the Martins held a news conference on January 13, 1997 and identified him by name as the Democratic Congressman to whom they had given the tape. Def.'s Answer at 10. Consequently, on January 13, 1997, Defendant was forced to finally admit his true role in the tape's disclosure. Compl. ¶ 24; Answer at 10 (On "[t]hat same day, after the Martin's news conference, defendant McDermott delivered a copy of the tape to the House Ethics Committee. Rep. Johnson, Chair of the Committee, immediately sent the tape to the United States Department of Justice. Defendant McDermott resigned from the Ethics Committee that same day."). Defendant's action of immediately inviting Clymer to listen to the tape is uncontested, and his subsequent attempts in the days following to conceal this disclosure reflects that McDermott knew he had obtained the tape improperly.

To counter all of these facts, Defendant relies primarily on faulty recollection as to crucial questions regarding what he knew and when he knew it. As to whether or not he read the cover letter, Defendant asserted only that "if I read it, I don't remember it." *Id.* at 150. Confronted with the newspaper article indicating that he told Clymer of the Martins' method of illegal intercept, Defendant responded, "I wouldn't say I didn't say it. I just don't recall it." *Id.* at 156. As to the portion of Clymer's article indicating that Defendant knew of the tape's illegal origin, Defendant explained that "[he does not] know how that got there [in the newspaper article]

because [he does not] remember ever reading that." *Id.* at 157. Finally, when asked whether, as the newspaper article implies, the Martins related to him the manner in which they illegally obtained the tape, Defendant replied only that he does "not remember one way or another." *Id.*

Even though the Court has "assume[d] the truth of all statements proffered by the party [i.e., McDermott] opposing summary judgment," *Greene v. Dalton*, 164 F.3d 671, 674 (D.C.Cir.1999), all that is gained from this is an understanding that McDermott claims he cannot remember whether or not he saw the cover letter. Defendant's repeated reliance on faulty memory in the face of direct contrary evidence fails to create a genuine issue of material fact. *See, e.g., Federal Election Comm'n v. Toledano*, 317 F.3d 939, 950 (9th Cir.2002) ( [F]ailure to remember and lack of knowledge are not sufficient to create a genuine dispute."); *FDIC v. Natl'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 205 F.3d 66, 75 (2d Cir.2000) ("[V]ague denials and memory memory lapses ... do not create genuine issues of material fact.")

The case at hand is distinguishable from *Bartnicki* on a very important point: In *Bartnicki*, defendant "Yocum ... testified that he had found the tape in his mailbox shortly after the interception" and then later delivered the tape to radio commentator Vopper who, along with "other individuals and media representatives," published the contents of the conversation found on the tape. 532 U.S. at 519, 121 S.Ct. 1753. In the instant case, however, McDermott actively accepted the tape from the people who had illegally recorded it. McDermott knew not only that he was receiving a tape from two strangers from Florida, *see* McDermott Dep. at 158, 171–72, but—as detailed in their cover letter— who those people were and how they had made the recording. In *Bartnicki*, the

Supreme Court noted the importance of this when it wrote that "[i]n the *Boehner* case, as in this suit, a conversation over a car cell phone was intercepted, but in that case the defendant knew both who was responsible for intercepting the conversation and how they had done it." 532 U.S. at 522 n. 5, 121 S.Ct. 1753 (citation omitted). Moreover, McDermott played an essential role in the disclosure for which the Martins pleaded guilty and were fined. This is evident because the Martins first "attempted to give the tape to Congresswoman Karen Thurman [but] were advised by her to turn the tape directly over to [McDermott.]" Cover Letter (found at Pl.'s SUF Ex. B–8). Put simply, the Martins could not have completed their disclosure without the active assistance of McDermott, who joined in the Martins' violation of 18 U.S.C. § 2511(1)(c) by knowingly joining in the Martins' illegal actions.

In sum, all of the evidence is uncontradicted that at the time he took possession of the tape, Defendant was aware of the cover letter and, more importantly, knew of the Martin's illegal activity. In light of the discovery and evidence now available to this Court at the summary judgment phase of the case, it is also uncontradicted that McDermott knew he was receiving a tape recording that had been illegally obtained. As a result, the Court finds that no genuine issue of fact arises as to Defendant's knowledge of the illegal transaction in which he was participating by accepting the tape from the Martins. The Court of Appeals's reasoning that flowed from this assertion thus continues to apply, and Defendant's claimed First Amendment defense fails in light of the applicable intermediate scrutiny. Therefore, Plaintiff is entitled to judgment as a matter of law with respect to Defendant's disclosure in violation of 18 U.S.C. § 2511(1)(c).

## V. CONCLUSION

For the reasons stated above, the Court finds that the Florida statute is inapplicable and so Plaintiff's Motion for Summary Judgment is denied in part and Defendant's Motion for Summary Judgment is granted in part. As to the federal statute, however, the Court finds that because Defendant McDermott participated in an illegal transaction when he accepted the tape from the Martins, he is without First Amendment protection and Plaintiff Boehner is therefore entitled to judgment as a matter of law. To this extent, Plaintiff's Motion for Summary Judgment is granted in part and Defendant's Motion for Summary Judgment is denied in part.

Since the Court has found that Plaintiff is entitled to judgment as a matter of law with respect to Defendant's disclosure in violation of 18 U.S.C. § 2511(1)(c), the remaining question is one of damages. As discussed in the Order that accompanies this Opinion, the Court would benefit from limited additional briefing as to whether the Court should award Plaintiff any attorney's fees and costs, and whether an award of punitive damages is appropriate.

## *ORDER*

Pending before the Court are Plaintiff and Defendant's cross motions for summary judgment. For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that Defendant's Motion for Summary Judgment [# 67] is **GRANTED IN PART and DENIED IN PART**, and that Plaintiff's Motion for Summary Judgment [# 68] is **GRANTED IN PART and DENIED IN PART**. It is further

**ORDERED** that a status hearing shall occur on Thursday, September 16, 2004 at 3:00 p.m. to discuss the issues of damages, fees, and costs. The parties may each file

a concise statement of their positions by 5:00 p.m. on Friday, September 10, 2004.