RANDOLPH, Circuit Judge.
After the Supreme Court vacated our decision in Boehner v. McDermott, 191 F.3d 463 (D.C.Cir.1999) (Boehner I), and returned the case to us for further consideration in light of Bartnicki v. Vopper, 532 U.S. 514, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001), see 532 U.S. 1050, 121 S.Ct. 2190, 149 L.Ed.2d 1022 (2001), we remanded the case to the district court; the parties engaged in discovery; and, on cross motions, the district court granted summary judgment in favor of Representative John A. Boehner, awarding him $10,000 in statutory damages, see 18 U.S.C. § 2520(c)(2), $50,000 in punitive damages, and reasonable attorney fees and costs. The issue on appeal is whether undisputed facts prove that Representative James A. McDermott “unlawfully” obtained the tape recording of an illegally-intercepted conversation in which Representative Boehner participated. See Bartnicki, 532 U.S. at 532 n. 19, 121 S.Ct. 1753.
Plaintiff John A. Boehner represents Ohio’s Eighth District; defendant James A. McDermott represents Washington’s Seventh District. The complaint alleged that Representative McDermott violated 18 U.S.C. § 2511(l)(c) when he disclosed an illegally-intercepted conversation in *207 which Representative Boehner participated. The record developed in discovery showed the following.
On December 21, 1996, Representative Boehner participated in a conference call with members of the Republican Party leadership, including then-Speaker of the House Newt Gingrich. At the time of the conversation Gingrich was the subject of an investigation by the House Committee on Standards of Official Conduct, commonly known as the House Ethics Committee. Representative Boehner was chairman of the House Republican Conference. The participants discussed various strategies regarding how to deal with an expected Ethics Subcommittee announcement of Gingrich’s agreement to accept a reprimand and to pay a fine in exchange for the Committee’s promise not to hold a hearing.
Representative Boehner was driving through Florida when he joined the conference call. He spoke from a cellular telephone in his car. John and Alice Martin, who lived in Florida, used a police radio scanner to eavesdrop on the conversation, in violation of 18 U.S.C. § 2511(l)(a). They recorded the call and delivered a tape of the conversation in a sealed envelope to the Florida office of then-Representative Karen Thurman. The tape was forwarded to Thurman’s Washington office. Thurman’s chief of staff learned from her, on January 8, 1997, that the Martins would be visiting her office in Washington. Both Thurman and her chief of staff sought legal advice about accepting the tape. At some point they consulted then-Representative David Bonior’s chief of staff and legislative director. Stan Brand, former General Counsel to the House of Representatives, advised that the tape should not be accepted under any circumstances and that it should be turned over to the Ethics Committee or other appropriate authorities. When the Martins arrived at Thurman’s office, her chief of staff returned the tape in its unopened envelope and suggested that they turn it over to the Ethics Committee.
At about 5 p.m. on January 8, 1997, in a small anteroom adjacent to the Ethics Committee hearing room, the Martins delivered the tape to Representative McDermott in a sealed 8-1/2" by 11" envelope. At the time, Representative McDermott was the ranking Democrat on the Ethics Committee. A conversation between the Martins and Representative McDermott ensued, of which more hereafter. With the envelope the Martins also delivered a business card and a typed letter, dated January 8, 1997, and addressed to “Committee on Standards of Official Conduct ... Jim McDermott, Ranking Member.” The letter stated:
Enclosed in the envelope you will find a tape of a conversation heard December 21, 1996 at about 9:45 a.m. The call was a conference call heard over a scanner. We felt the information included were of importance to the committee. We live in the 5th. Congressional District and attempted to give the tape to Congresswoman Karen Thurman. We were advised by her to turn the tape directly over to you. We also understand that we will be granted immunity.
My husband and I work for Columbia County Schools in Columbia County Florida. We pray that committee will consider our sincerity in placing it in your hands.
We will return to our home today.
Thank you for your consideration.
John and Alice Martin
Representative McDermott then returned to the Ethics Committee hearing room.
Later that evening, during a recess, Representative McDermott left the Ethics Committee hearing room and went to his office. There he opened the Martins’ envelope, dumped out the contents, and lis *208 tened to the tape. Still later, he called two reporters: Jeanne Cummings of the Atlanta Journal-Constitution, for whom he left a message, and Adam Clymer of the New York Times, whom he reached. Clymer went to Representative McDermott’s office, listened to the tape, and made a recording of it. After Cummings returned Representative McDermott’s call the next day, he invited her to his office and shared the tape with her.
On January 10, 1997, Clymer published a front-page article in the New York Times entitled “Gingrich Is Heard Urging Tactics in Ethics Case.” The article, which included lengthy excerpts of the taped conversation, reported the circumstances leading to disclosure of the tape:
The call was taped by people in Florida who were unsympathetic to Mr. Gingrich and who said they heard it on a police scanner that happened to pick up the cellular telephone transmission of one of the participants. It was given to a Democratic Congressman, who made the tape available to the New York Times.....
Mr. Gingrich, Mr. Bethune and the others discussed their tactics in a conference call, a transcript of which was made available by a Democratic Congressman hostile to Mr. Gingrich who insisted that he not be identified further.
The Congressman said the tape had been given to him on Wednesday by a couple who said they were from northern Florida. He quoted them as saying it had been recorded off a radio scanner, suggesting that one participant was using a cellular telephone. They said it was recorded about 9:45 A.M. on Dec. 21.
Adam Clymer, Gingrich Is Heard Urging Tactics in Ethics Case, N.Y. Times, Jan. 10,1997, at Al, A20. The Atlanta Journal-Constitution ran a similar story on January 11th.
On January 13, 1997, the Martins held a press conference and identified Representative McDermott as the Congressman to whom they delivered the tape. Representative McDermott then sent copies of the tape to the offices of the House Ethics Committee and resigned from the Committee. The Committee Chairman, Representative Nancy Johnson, forwarded the tape to the Justice Department. The government prosecuted the Martins for violating 18 U.S.C. § 2511(l)(a), the provision forbidding unauthorized interception of “wire, oral, or electronic communication.” The Martins pled guilty and were fined $500.
On cross-motions for summary judgment the district court held that Representative McDermott violated 18 U.S.C. § 2511(l)(c) when he disclosed the tape to the reporters. Boehner v. McDermott, 332 F.Supp.2d 149, 158 (D.D.C.2004) (Boehner II). Section 2511(l)(c) makes intentional disclosure of any illegally-intercepted conversation a criminal offense if the person disclosing the communication knew or had “reason to know” that it was so acquired. The Bartnicki Court held that under the First Amendment, § 2511(l)(c) was invalid as applied to individuals who lawfully obtained a tape of such a conversation and then disclosed it, 532 U.S. at 535, 121 S.Ct. 1753[1]; the Court added that its holding *209 did not apply to those who obtain the information unlawfully, id. at 532 n. 19, 121 S.Ct. 1753. The district court therefore viewed the crucial issue to be whether Representative McDermott lawfully obtained the tape from the Martins. See Boehner II, 332 F.Supp.2d at 163-64. The court held that there was no genuine issue of material fact that the Martins’ letter to Representative McDermott was on the outside of the envelope containing the tape and that he must have read it. Id. at 166— 67, 169. This established Representative McDermott’s knowledge of the Martins’ illegal interception at the time he received the tape. It followed that he had not lawfully obtained the tape. Id. at 165-66, 169.
According to Representative McDermott, the district court misinterpreted Bartnicki. As he reads the Supreme Court’s opinion, any individual who did not participate in the illegal interception of a conversation has a First Amendment right to disclose it.
It is true that in Bartnicki the defendants had no connection to the illegal interception. The tape of the conversation wound up in Yocum’s mailbox, placed there by some unknown person. 532 U.S. at 519, 525, 121 S.Ct. 1753. Neither Yocum nor the radio broadcaster who played the tape on his program after Yocum gave it to him knew who had done the intercepting. The Court mentioned the anonymity of the interceptor several times, id. at 525, 530 & n. 15, 531, 535, 121 S.Ct. 1753, and distinguished this case on that ground:
In the Boehner case, as in this suit, a conversation over a car cell phone was intercepted, but in that case the defendant knew both who was responsible for intercepting the conversation and how they had done it. 191 F.3d, at 465. In the opinion of the majority, the defendant acted unlawfully in accepting the tape in order to provide it to the media. Id., at 476.
532 U.S. at 522 n. 5, 121 S.Ct. 1753. We do not want to read too much into the Court’s “but” in the first sentence, yet one must wonder why the Court drew this distinction if it meant to adopt the rule Representative McDermott urges on us. Elsewhere in the Bartnicki opinion the Court stressed that it had before it only an “as applied” challenge to the federal statute, id. at 524, 525, 121 S.Ct. 1753; that in light of the facts of the case, the question presented was “narrow,” id. at 517, 528, 529, 121 S.Ct. 1753; and that it was deciding only that those who lawfully obtain information have a First Amendment right to disclose it to the public, id. at 525, 528, 121 S.Ct. 1753 (quoting Smith v. Daily Mail Publ’g Co., 443 U.S. 97, 103, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979), and Florida Star v. B.J.F., 491 U.S. 524, 535 n. 8, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989)). The Court also stated that its “holding, of course, does not apply to punishing parties for obtaining the relevant information unlawfully.” Id. at 532 n. 19, 109 S.Ct. 2603.
Representative McDermott’s reading of these and other statements of the Court is quite implausible. By his logic, if he stole the tape from the Martins he would have lawfully obtained it because he did not participate in the initial illegal interception. Among other statements in the majority opinion, footnote 19 — which we have just quoted- — clearly stands for the opposite proposition. Justice Breyer, in his concurring opinion, in which Justice O’Connor joined, understood as much. Citing footnote 19, he distinguished cases in which the person who disclosed the conversation “aided or abetted ... the later delivery of the tape by the interceptor to an intermediary, or the tape’s still later delivery by the intermediary to the media.” Id. at 538, 109 S.Ct. 2603 (Breyer, *210 J., concurring) (citing the federal aiding and abetting statute, 18 U.S.C. § 2).
The eavesdropping statute may not itself make receiving a tape of an illegally-intercepted conversation illegal. See id. at 525, 528, 109 S.Ct. 2603; see also 18 U.S.C. § 2511(1). But it does not follow that anyone who receives a copy of such a conversation has obtained it legally and has a First Amendment right to disclose it. If that were the case, then the holding in BaHnicki is not “narrow” as the Court stressed, but very broad indeed. On the other hand, to hold that a person who knowingly receives a tape .from an illegal interceptor either aids and abets the interceptor’s second violation (the disclosure), or participates in an illegal transaction would be to take the Court at its word. It also helps explain why the Court thought it so significant that the illegal interceptor in Bartnicki was unknown, see 532 U.S. at 519, 522 n. 5, 525, 530 & n. 15, 531, and why the Court distinguished this case on that ground, see id. at 522 n. 5, 121 S.Ct. 1753.[2]
As to the evidence, the district court stated that if Representative McDermott
read the cover letter or the Martins related its relevant contents to him at the time [he] received the tape, he would have possessed sufficient knowledge of the illegal transaction to have unlawfully obtained the tape .... On the other hand, if [Representative McDermott] learned' of the contents of the letter at some later time after taking possession of the tape, ... the case more closely resembles BaHnicki ....
Boehner II, 332 F.Supp.2d at 165-66. The court then reached two conclusions: the Martins’ cover letter was outside the envelope containing the tape and Representative McDermott read it when the Martins’ handed it to him, not when he later returned to his office to listen to the tape. Id. at 166-67, 169. Representative McDermott objects that both of the court’s conclusions rested on material facts that were genuinely in dispute and that summary judgment was therefore improper. Our de novo review of the judgment, see, e.g., Branch Ministries v. Rossotti, 211 F.3d 137, 141 (D.C.Cir.2000), supports his position.
The cover letter stated: “Enclosed in the envelope you will find a tape.” But this does not prove that the letter was outside the envelope containing the tape. The tape was in fact “enclosed” regardless where the Martins placed the letter.[3] And even if the letter was outside the envelope, this does not prove that Representative McDermott read it at the time he received the tape. “[C]ommon sense” may indicate, as the district court wrote, “that one who accepts from strangers a package with a short accompanying letter is likely to read the letter .... ” Boehner II, 332 F.Supp.2d at 166. But at the summary judgment stage, the nonmoving party is entitled to “all justifiable inferences” from the evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Salazar v. Wash. Metro. Area Transit Auth., 401 F.3d 504, 507 (D.C.Cir.2005). Here Representative McDermott did not simply rest on “allegations or denials of the adverse party’s pleading.” Fed. R. Civ. P. 56(e). As Rule 56 requires, he *211 adduced evidence — his deposition testimony — in which he denied ever having seen the letter. A justifiable inference from that evidence is that he did not read it.[4]
While there was a genuine issue of material fact regarding Representative McDermott’s knowledge of the cover letter, we nevertheless conclude that Representative Boehner was “entitled to a judgment as a matter of law.” Fed. R. Civ. P. 56(c); see Teamsters Local Union No. 61 v. United Parcel Serv., Inc., 272 F.3d 600, 603-04 (D.C.Cir.2001); Samii v. Billington, 195 F.3d 1, 3 (D.C.Cir.1999); Doe v. Gates, 981 F.2d 1316, 1322 (D.C.Cir.1993). We start with the New York Times article. Clymer reported that a certain Congressman, later identified as Representative McDermott, “quoted” the interceptors (the Martins) as saying that the conversation was “recorded off a radio scanner.” The evidence shows that there were only two ways Representative McDermott could have known this — from the cover letter or from his conversation with the Martins in the anteroom when they handed him the tape. We may eliminate the cover letter. As we have just said, Representative McDermott denied having read it. His denials were unequivocal — they were not of the I-do-not-recall-one-way-or-the-other variety. This leaves only the oral conversation. Unlike his unequivocal denial of ever having read the cover letter, Representative McDermott does not deny that the Martins told him they used a scanner to intercept the conversation. He testified only that he could “not remember one way or another.” Nor does Representative McDermott deny telling Clymer, the New York Times reporter, that the Martins told him they recorded the conversation over a scanner. He testified only that “I wouldn’t say I didn’t say it. I just don’t recall it.” This is insufficient to draw into dispute Representative Boehner’s statement of undisputed facts that Representative McDermott told Clymer “that [the Martins] had heard and recorded the conversation over a police scanner on December 21, 1996 at 9:45 a.m.” See FEC v. Toledano, 317 F.3d 939, 949-50 (9th Cir.2002); FDIC v. Nat’l Union Fire Ins. Co. of Pittsburgh, 205 F.3d 66, 75 (2d Cir.2000). While a court should draw all justifiable evidentiary inferences in favor of the non-moving party, there is no such inference to draw in Representative McDermott’s favor. See Lusk v. Foxmeyer Health Corp., 129 F.3d 773, 779-80 (5th Cir.1997); Crabbs v. Copperweld Tubing Prods. Co., 114 F.3d 85, 88 (6th Cir.1997); DeLuca v. Winer Indus., Inc., 53 F.3d 793, 798 (7th Cir.1995).
Because there was no genuine dispute that Representative McDermott knew the Martins had illegally intercepted the conversation, he did not lawfully obtain the tape from them. The Martins violated § 2511 not once, but twice — first when they intercepted the call and second when they disclosed it to Representative McDermott. It is of little moment whether Representative McDermott’s complicity constituted aiding and abetting their criminal act,[5] or the formation of a conspiracy with *212 them, or amounted to participating in an illegal transaction.[6] The difference between this case and Bartnicki is plain to see.[7] It is the difference between someone who discovers a bag containing a diamond ring on the sidewalk and someone who accepts the same bag from a thief, knowing the ring inside to have been stolen. The former has committed no offense; the latter is guilty of receiving stolen property, even if the ring was intended only as a gift.[8] See Model Penal Code § 223.6(1) (1962); D.C. Code § 22-3232; see also Williams v. United States, 281 A.2d 293, 294 (D.C.1971) (citing Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964); Wilson v. United States, 162 U.S. 613, 619, 16 S.Ct. 895, 40 L.Ed. 1090 (1896)) (explaining a prior version of § 22-3232).

Affirmed.

. The Court also held that for the First Amendment to shield disclosure, the conversation must contain information of “public concern.” 532 U.S. at 535, 121 S.Ct. 1753. But see Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), in which the Court refused to make the First Amendment turn on such a consideration in light of the “difficulty of forcing state and federal judges to decide on an ad hoc basis which publications address issues of ‘general or public interest' and which do not .... We doubt the wisdom of committing this task to the conscience of judges." Id. at 346, 94 S.Ct. 2997.

. The Court added that "[i]n the opinion of the majority, the defendant [Representative McDermott] acted unlawfully in accepting the tape in order to provide it to the media.” 532 U.S. at 522 n. 5, 121 S.Ct. 1753. (The case came to us on appeal from the dismissal of a complaint; our conclusion was based on a construction of the complaint. See Boehner I, 191 F.3d at 464 & n. 1).

. The Martins apparently were not deposed.

. Representative McDermott also makes much of his testimony that he did not know what was on the tape when he received it. But this is not evidence tending to show his failure to read the letter when the Martins handed him the tape. Even if he read the cover letter he would not have known what the tape contained. As to the contents of the tape, the letter said only that it would be “of importance to the committee.”

. See 2 Wayne R. LaFave, Substantive Criminal Law § 13.2(a) (2d ed.2003); id. § 13.2(b), at 344 ("Generally, it may be said that accomplice liability exists when the accomplice intentionally encourages or assists, in the sense that his purpose is to encourage or assist another in the commission'of a crime as to which the accomplice has the requisite mental state.”); United States v. Walker, 99 F.3d 439, 442 (D.C.Cir.1996) (explaining the *212 "shared intent” standard for aiding and abetting as an "overlap with (but not necessarily match) the criminal intent of the principal”); see also United States v. Yakou, 428 F.3d 241, 252 (D.C.Cir.2005) (stating the "long ... established [principle] that a person can be convicted of aiding and abetting another person's violation of a statute even if it would be impossible to convict the aider and abettor as a principal").

. As Chief Judge Ginsburg wrote in the original appeal: "One who obtains information in an illegal transaction, with full knowledge the transaction is illegal, has not ‘lawfully obtained]' that information in any meaningful sense.” Boehner I, 191 F.3d at 479 (Ginsburg, J., concurring) (alteration in original).

. Our dissenting colleague believes that the Supreme Court’s resolution of the conflict between Boehner I and Bartnicki v. Vopper, 200 F.3d 109 (3d Cir.1999), in favor of the Third Circuit’s decision implicitly means that Representative McDermott had a First Amendment right to disclose the tape. Dissenting Op. at 1018; see also id. at 1020. If the Court had agreed with our colleague, it would have reversed our decision; instead, it vacated and remanded for reconsideration. Furthermore, one must pay close attention to the nature of the conflict between Boehner I and the Third Circuit's decision. We held that the statute was content neutral and that it was constitutional as applied, because it survived intermediate scrutiny. Boehner I, 191 F.3d at 467-70. The Third Circuit held that the statute was content neutral but did not survive intermediate scrutiny as applied. Bartnicki, 200 F.3d at 123-29. In resolving that conflict the Court held only that someone who lawfully obtains an illegally-intercepted conversation may disclose it, which still leaves the question we face in this case: whether Representative McDermott lawfully obtained the tape from the Martins.
Our colleague also thinks it matters little that the Supreme Court distinguished Boehner I on the ground that McDermott may have participated in an illegal transaction. Dissenting Op. at 1021-22. It matters little, he writes, because the Court did the distinguishing in the factual portion of the opinion. Id. But that makes our point. As we have explained, the facts of this case are, in important respects, quite different than those in Bartnicki.

.We do not understand Representative McDermott to be arguing that even if he unlawfully obtained the illegally-intercepted conversation, he had a First Amendment right to disclose the tape. See generally Boehner I, 191 F.3d 463; id. at 479 (Ginsburg, J., concurring).