# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 15, 2005　　　　Decided March 28, 2006

No. 04-7203

JOHN A. BOEHNER,
APPELLEE

v.

JAMES A. MCDERMOTT,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 98cv00594)

———

*Frank Cicero, Jr.* argued the cause for appellant. With him on the briefs was *Christopher Landau*.

*Theodore J. Boutrous, Jr.* and *Thomas H. Dupree, Jr.* were on the brief of *amici curiae* Dow Jones & Company, Inc., et al. in support of appellant.

*Michael A. Carvin* argued the cause for appellee. With him on the brief was *Louis K. Fisher*.

Before: GINSBURG, *Chief Judge*, and SENTELLE and RANDOLPH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* RANDOLPH.

Dissenting opinion filed by *Circuit Judge* SENTELLE.

RANDOLPH, *Circuit Judge*: After the Supreme Court vacated our decision in *Boehner v. McDermott*, 191 F.3d 463 (D.C. Cir. 1999) (*Boehner I*), and returned the case to us for further consideration in light of *Bartnicki v. Vopper*, 532 U.S. 514 (2001), *see* 532 U.S. 1050 (2001), we remanded the case to the district court; the parties engaged in discovery; and, on cross motions, the district court granted summary judgment in favor of Representative John A. Boehner, awarding him $10,000 in statutory damages, *see* 18 U.S.C. § 2520(c)(2), $50,000 in punitive damages, and reasonable attorney fees and costs. The issue on appeal is whether undisputed facts prove that Representative James A. McDermott "unlawfully" obtained the tape recording of an illegally-intercepted conversation in which Representative Boehner participated. *See Bartnicki*, 532 U.S. at 532 n.19.

Plaintiff John A. Boehner represents Ohio's Eighth District; defendant James A. McDermott represents Washington's Seventh District. The complaint alleged that Representative McDermott violated 18 U.S.C. § 2511(1)(c) when he disclosed an illegally-intercepted conversation in which Representative Boehner participated. The record developed in discovery showed the following.

On December 21, 1996, Representative Boehner participated in a conference call with members of the Republican Party leadership, including then-Speaker of the House Newt Gingrich. At the time of the conversation Gingrich was the subject of an investigation by the House Committee on Standards of Official Conduct, commonly known as the House Ethics Committee. Representative Boehner was chairman of the

House Republican Conference. The participants discussed various strategies regarding how to deal with an expected Ethics Subcommittee announcement of Gingrich's agreement to accept a reprimand and to pay a fine in exchange for the Committee's promise not to hold a hearing.

Representative Boehner was driving through Florida when he joined the conference call. He spoke from a cellular telephone in his car. John and Alice Martin, who lived in Florida, used a police radio scanner to eavesdrop on the conversation, in violation of 18 U.S.C. § 2511(1)(a). They recorded the call and delivered a tape of the conversation in a sealed envelope to the Florida office of then-Representative Karen Thurman. The tape was forwarded to Thurman's Washington office. Thurman's chief of staff learned from her, on January 8, 1997, that the Martins would be visiting her office in Washington. Both Thurman and her chief of staff sought legal advice about accepting the tape. At some point they consulted then-Representative David Bonior's chief of staff and legislative director. Stan Brand, former General Counsel to the House of Representatives, advised that the tape should not be accepted under any circumstances and that it should be turned over to the Ethics Committee or other appropriate authorities. When the Martins arrived at Thurman's office, her chief of staff returned the tape in its unopened envelope and suggested that they turn it over to the Ethics Committee.

At about 5 p.m. on January 8, 1997, in a small anteroom adjacent to the Ethics Committee hearing room, the Martins delivered the tape to Representative McDermott in a sealed 8-1/2" by 11" envelope. At the time, Representative McDermott was the ranking Democrat on the Ethics Committee. A conversation between the Martins and Representative McDermott ensued, of which more hereafter. With the envelope the Martins also delivered a business card and a typed letter,

dated January 8, 1997, and addressed to "Committee on Standards of Official Conduct . . . Jim McDermott, Ranking Member." The letter stated:

> Enclosed in the envelope you will find a tape of a conversation heard December 21, 1996 at about 9:45 a.m. The call was a conference call heard over a scanner. We felt the information included were of importance to the committee. We live in the 5th. Congressional District and attempted to give the tape to Congresswoman Karen Thurman. We were advised by her to turn the tape directly over to you. We also understand that we will be granted immunity.
>
> My husband and I work for Columbia County Schools in Columbia County Florida. We pray that committee will consider our sincerity in placing it in your hands.
>
> We will return to our home today.
>
> Thank you for your consideration.
>
> John and Alice Martin

Representative McDermott then returned to the Ethics Committee hearing room.

Later that evening, during a recess, Representative McDermott left the Ethics Committee hearing room and went to his office. There he opened the Martins' envelope, dumped out the contents, and listened to the tape. Still later, he called two reporters: Jeanne Cummings of the *Atlanta Journal-Constitution*, for whom he left a message, and Adam Clymer of the *New York Times*, whom he reached. Clymer went to Representative McDermott's office, listened to the tape, and

made a recording of it. After Cummings returned Representative McDermott's call the next day, he invited her to his office and shared the tape with her.

On January 10, 1997, Clymer published a front-page article in the *New York Times* entitled "Gingrich Is Heard Urging Tactics in Ethics Case." The article, which included lengthy excerpts of the taped conversation, reported the circumstances leading to disclosure of the tape:

> The call was taped by people in Florida who were unsympathetic to Mr. Gingrich and who said they heard it on a police scanner that happened to pick up the cellular telephone transmission of one of the participants. It was given to a Democratic Congressman, who made the tape available to the New York Times. . . ..

> . . . .

> Mr. Gingrich, Mr. Bethune and the others discussed their tactics in a conference call, a transcript of which was made available by a Democratic Congressman hostile to Mr. Gingrich who insisted that he not be identified further.

> The Congressman said the tape had been given to him on Wednesday by a couple who said they were from northern Florida. He quoted them as saying it had been recorded off a radio scanner, suggesting that one participant was using a cellular telephone. They said it was recorded about 9:45 A.M. on Dec. 21.

Adam Clymer, *Gingrich Is Heard Urging Tactics in Ethics Case*, N.Y. TIMES, Jan. 10, 1997, at A1, A20. The *Atlanta Journal-Constitution* ran a similar story on January 11th.

On January 13, 1997, the Martins held a press conference and identified Representative McDermott as the Congressman to whom they delivered the tape. Representative McDermott then sent copies of the tape to the offices of the House Ethics Committee and resigned from the Committee. The Committee Chairman, Representative Nancy Johnson, forwarded the tape to the Justice Department. The government prosecuted the Martins for violating 18 U.S.C. § 2511(1)(a), the provision forbidding unauthorized interception of "wire, oral, or electronic communication." The Martins pled guilty and were fined $500.

On cross-motions for summary judgment the district court held that Representative McDermott violated 18 U.S.C. § 2511(1)(c) when he disclosed the tape to the reporters. *Boehner v. McDermott*, 332 F. Supp. 2d 149, 158 (D.D.C. 2004) (*Boehner II*). Section 2511(1)(c) makes intentional disclosure of any illegally-intercepted conversation a criminal offense if the person disclosing the communication knew or had "reason to know" that it was so acquired. The *Bartnicki* Court held that under the First Amendment, § 2511(1)(c) was invalid as applied to individuals who lawfully obtained a tape of such a conversation and then disclosed it, 532 U.S. at 535[1]; the Court

---

[1] The Court also held that for the First Amendment to shield disclosure, the conversation must contain information of "public concern." 532 U.S. at 535. But see *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), in which the Court refused to make the First Amendment turn on such a consideration in light of the "difficulty of forcing state and federal judges to decide on an *ad hoc* basis which publications address issues of 'general or public interest' and which do not . . .. We doubt the wisdom of committing this task to the

added that its holding did not apply to those who obtain the information unlawfully, *id.* at 532 n.19. The district court therefore viewed the crucial issue to be whether Representative McDermott lawfully obtained the tape from the Martins. *See Boehner II*, 332 F. Supp. 2d at 163-64. The court held that there was no genuine issue of material fact that the Martins' letter to Representative McDermott was on the outside of the envelope containing the tape and that he must have read it. *Id.* at 166-67, 169. This established Representative McDermott's knowledge of the Martins' illegal interception at the time he received the tape. It followed that he had not lawfully obtained the tape. *Id.* at 165-66, 169.

According to Representative McDermott, the district court misinterpreted *Bartnicki*. As he reads the Supreme Court's opinion, any individual who did not participate in the illegal interception of a conversation has a First Amendment right to disclose it.

It is true that in *Bartnicki* the defendants had no connection to the illegal interception. The tape of the conversation wound up in Yocum's mailbox, placed there by some unknown person. 532 U.S. at 519, 525. Neither Yocum nor the radio broadcaster who played the tape on his program after Yocum gave it to him knew who had done the intercepting. The Court mentioned the anonymity of the interceptor several times, *id.* at 525, 530 & n.15, 531, 535, and distinguished this case on that ground:

> In the *Boehner* case, as in this suit, a conversation over a car cell phone was intercepted, but in that case the defendant knew both who was responsible for intercepting the conversation and how they had done it. 191 F. 3d, at 465. In the opinion of the majority, the

---

conscience of judges." *Id.* at 346.

> defendant acted unlawfully in accepting the tape in order to provide it to the media. *Id.*, at 476.

532 U.S. at 522 n.5. We do not want to read too much into the Court's "but" in the first sentence, yet one must wonder why the Court drew this distinction if it meant to adopt the rule Representative McDermott urges on us. Elsewhere in the *Bartnicki* opinion the Court stressed that it had before it only an "as applied" challenge to the federal statute, *id.* at 524, 525; that in light of the facts of the case, the question presented was "narrow," *id.* at 517, 528, 529; and that it was deciding only that those who lawfully obtain information have a First Amendment right to disclose it to the public, *id.* at 525, 528 (quoting *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103 (1979), and *Florida Star v. B.J.F.*, 491 U.S. 524, 535 n.8 (1989)). The Court also stated that its "holding, of course, does not apply to punishing parties for obtaining the relevant information unlawfully." *Id.* at 532 n.19.

Representative McDermott's reading of these and other statements of the Court is quite implausible. By his logic, if he stole the tape from the Martins he would have lawfully obtained it because he did not participate in the initial illegal interception. Among other statements in the majority opinion, footnote 19 – which we have just quoted – clearly stands for the opposite proposition. Justice Breyer, in his concurring opinion, in which Justice O'Connor joined, understood as much. Citing footnote 19, he distinguished cases in which the person who disclosed the conversation "aided or abetted . . . the later delivery of the tape by the interceptor to an intermediary, or the tape's still later delivery by the intermediary to the media." *Id.* at 538 (Breyer, J., concurring) (citing the federal aiding and abetting statute, 18 U.S.C. § 2).

The eavesdropping statute may not itself make receiving a tape of an illegally-intercepted conversation illegal. *See id.* at 525, 528; *see also* 18 U.S.C. § 2511(1). But it does not follow that anyone who receives a copy of such a conversation has obtained it legally and has a First Amendment right to disclose it. If that were the case, then the holding in *Bartnicki* is not "narrow" as the Court stressed, but very broad indeed. On the other hand, to hold that a person who knowingly receives a tape from an illegal interceptor either aids and abets the interceptor's second violation (the disclosure), or participates in an illegal transaction would be to take the Court at its word. It also helps explain why the Court thought it so significant that the illegal interceptor in *Bartnicki* was unknown, *see* 532 U.S. at 519, 522 n.5, 525, 530 & n.15, 531, and why the Court distinguished this case on that ground, *see id.* at 522 n.5.[2]

As to the evidence, the district court stated that if Representative McDermott

> read the cover letter or the Martins related its relevant contents to him at the time [he] received the tape, he would have possessed sufficient knowledge of the illegal transaction to have unlawfully obtained the tape . . .. On the other hand, if [Representative McDermott] learned of the contents of the letter at some later time after taking possession of the tape, . . . the case more closely resembles *Bartnicki* . . ..

---

[2] The Court added that "[i]n the opinion of the majority, the defendant [Representative McDermott] acted unlawfully in accepting the tape in order to provide it to the media." 532 U.S. at 522 n.5. (The case came to us on appeal from the dismissal of a complaint; our conclusion was based on a construction of the complaint. *See Boehner I*, 191 F.3d at 464 & n.1).

*Boehner II*, 332 F. Supp. 2d at 165-66. The court then reached two conclusions: the Martins' cover letter was outside the envelope containing the tape and Representative McDermott read it when the Martins' handed it to him, not when he later returned to his office to listen to the tape. *Id.* at 166-67, 169. Representative McDermott objects that both of the court's conclusions rested on material facts that were genuinely in dispute and that summary judgment was therefore improper. Our *de novo* review of the judgment, *see, e.g.*, *Branch Ministries v. Rossotti*, 211 F.3d 137, 141 (D.C. Cir. 2000), supports his position.

The cover letter stated: "Enclosed in the envelope you will find a tape." But this does not prove that the letter was outside the envelope containing the tape. The tape was in fact "enclosed" regardless where the Martins placed the letter.[3] And even if the letter was outside the envelope, this does not prove that Representative McDermott read it at the time he received the tape. "[C]ommon sense" may indicate, as the district court wrote, "that one who accepts from strangers a package with a short accompanying letter is likely to read the letter . . .." *Boehner II*, 332 F. Supp. 2d at 166. But at the summary judgment stage, the nonmoving party is entitled to "all justifiable inferences" from the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see, e.g.*, *Matsuhita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *Salazar v. Wash. Metro. Area Transit Auth.*, 401 F.3d 504, 507 (D.C. Cir. 2005). Here Representative McDermott did not simply rest on "allegations or denials of the adverse party's pleading." FED. R. CIV. P. 56(e). As Rule 56 requires, he adduced evidence – his deposition testimony – in which he

---

[3] The Martins apparently were not deposed.

denied ever having seen the letter. A justifiable inference from that evidence is that he did not read it.[4]

While there was a genuine issue of material fact regarding Representative McDermott's knowledge of the cover letter, we nevertheless conclude that Representative Boehner was "entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Teamsters Local Union No. 61 v. United Parcel Serv., Inc.*, 272 F.3d 600, 603-04 (D.C. Cir. 2001); *Samii v. Billington*, 195 F.3d 1, 3 (D.C. Cir. 1999); *Doe v. Gates*, 981 F.2d 1316, 1322 (D.C. Cir. 1993). We start with the *New York Times* article. Clymer reported that a certain Congressman, later identified as Representative McDermott, "quoted" the interceptors (the Martins) as saying that the conversation was "recorded off a radio scanner." The evidence shows that there were only two ways Representative McDermott could have known this – from the cover letter or from his conversation with the Martins in the anteroom when they handed him the tape. We may eliminate the cover letter. As we have just said, Representative McDermott denied having read it. His denials were unequivocal – they were not of the I-do-not-recall-one-way-or-the-other variety. This leaves only the oral conversation. Unlike his unequivocal denial of ever having read the cover letter, Representative McDermott does not deny that the Martins told him they used a scanner to intercept the conversation. He testified only that he could "not remember one way or another." Nor does Representative McDermott deny telling Clymer, the

---

[4] Representative McDermott also makes much of his testimony that he did not know what was on the tape when he received it. But this is not evidence tending to show his failure to read the letter when the Martins handed him the tape. Even if he read the cover letter he would not have known what the tape contained. As to the contents of the tape, the letter said only that it would be "of importance to the committee."

*New York Times* reporter, that the Martins told him they recorded the conversation over a scanner. He testified only that "I wouldn't say I didn't say it. I just don't recall it." This is insufficient to draw into dispute Representative Boehner's statement of undisputed facts that Representative McDermott told Clymer "that [the Martins] had heard and recorded the conversation over a police scanner on December 21, 1996 at 9:45 a.m." *See FEC v. Toledano*, 317 F.3d 939, 949-50 (9th Cir. 2002); *FDIC v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 205 F.3d 66, 75 (2d Cir. 2000). While a court should draw all justifiable evidentiary inferences in favor of the non-moving party, there is no such inference to draw in Representative McDermott's favor. *See Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 779-80 (5th Cir. 1997); *Crabbs v. Copperweld Tubing Prods. Co.*, 114 F.3d 85, 88 (6th Cir. 1997); *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 798 (7th Cir. 1995).

Because there was no genuine dispute that Representative McDermott knew the Martins had illegally intercepted the conversation, he did not lawfully obtain the tape from them. The Martins violated § 2511 not once, but twice – first when they intercepted the call and second when they disclosed it to Representative McDermott. It is of little moment whether Representative McDermott's complicity constituted aiding and abetting their criminal act,[5] or the formation of a conspiracy with

---

[5] *See* 2 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 13.2(a) (2d ed. 2003); *id.* § 13.2(b), at 344 ("Generally, it may be said that accomplice liability exists when the accomplice intentionally encourages or assists, in the sense that his purpose is to encourage or assist another in the commission of a crime as to which the accomplice has the requisite mental state."); *United States v. Walker*, 99 F.3d 439, 442 (D.C. Cir. 1996) (explaining the "shared intent" standard for aiding and abetting as an "overlap with (but not necessarily match) the criminal intent of the principal"); *see also United States v. Yakou*, 428

them, or amounted to participating in an illegal transaction.[6] The difference between this case and *Bartnicki* is plain to see.[7]

---

F.3d 241, 252 (D.C. Cir. 2005) (stating the "long . . . established [principle] that a person can be convicted of aiding and abetting another person's violation of a statute even if it would be impossible to convict the aider and abettor as a principal").

[6] As Chief Judge Ginsburg wrote in the original appeal: "One who obtains information in an illegal transaction, with full knowledge the transaction is illegal, has not 'lawfully obtain[ed]' that information in any meaningful sense." *Boehner I*, 191 F.3d at 479 (Ginsburg, J., concurring) (alteration in original).

[7] Our dissenting colleague believes that the Supreme Court's resolution of the conflict between *Boehner I* and *Bartnicki v. Vopper*, 200 F.3d 109 (3d Cir. 1999), in favor of the Third Circuit's decision implicitly means that Representative McDermott had a First Amendment right to disclose the tape. Dissenting Op. at 2; *see also id.* at 5. If the Court had agreed with our colleague, it would have reversed our decision; instead, it vacated and remanded for reconsideration. Furthermore, one must pay close attention to the nature of the conflict between *Boehner I* and the Third Circuit's decision. We held that the statute was content neutral and that it was constitutional as applied, because it survived intermediate scrutiny. *Boehner I*, 191 F.3d at 467-70. The Third Circuit held that the statute was content neutral but did not survive intermediate scrutiny as applied. *Bartnicki*, 200 F.3d at 123-29. In resolving that conflict the Court held only that someone who lawfully obtains an illegally-intercepted conversation may disclose it, which still leaves the question we face in this case: whether Representative McDermott lawfully obtained the tape from the Martins.

Our colleague also thinks it matters little that the Supreme Court distinguished *Boehner I* on the ground that McDermott may have participated in an illegal transaction. Dissenting Op. at 7-8. It matters little, he writes, because the Court did the distinguishing in the factual portion of the opinion. *Id.* But that makes our point. As we

It is the difference between someone who discovers a bag containing a diamond ring on the sidewalk and someone who accepts the same bag from a thief, knowing the ring inside to have been stolen. The former has committed no offense; the latter is guilty of receiving stolen property, even if the ring was intended only as a gift.[8] *See* MODEL PENAL CODE § 223.6(1) (1962); D.C. CODE § 22-3232; *see also Williams v. United States*, 281 A.2d 293, 294 (D.C. 1971) (citing *Rugendorf v. United States*, 376 U.S. 528 (1964); *Wilson v. United States*, 162 U.S. 613, 619 (1896)) (explaining a prior version of § 22-3232).

*Affirmed.*

---

have explained, the facts of this case are, in important respects, quite different than those in *Bartnicki*.

[8] We do not understand Representative McDermott to be arguing that even if he unlawfully obtained the illegally-intercepted conversation, he had a First Amendment right to disclose the tape. *See generally Boehner I*, 191 F.3d 463; *id.* at 479 (Ginsburg, J., concurring).

SENTELLE, J., *dissenting*: In the first eight paragraphs of its opinion, the majority accurately lays out the somewhat extended history of this case. Two persons not parties to the case unlawfully intercepted communications of the appellee and gave a tape of the communications to the appellant in violation of 18 U.S.C. § 2511(1)(a) and (1)(c). Appellee brought the present action, which the district court dismissed, reasoning this application of the statute violated the First Amendment guarantee to the right of free speech.

The defendant appealed. In a split decision, a panel of this court (identical to the present panel) reversed the dismissal, holding that the application of section 2511(1)(c) and a parallel Florida statute "are not unconstitutional as applied in this case." *Boehner v. McDermott*, 191 F.3d 463, 478 (D.C. Cir. 1999); *see also id.* at 480 (Ginsburg, J., concurring). I disagreed with the majority's opinion then, as I do today. As I perceived the case then, and as I perceive it now, the issue is: "Where the punished publisher of information has obtained the information in question in a manner lawful in itself but from a source who has obtained it unlawfully, may the government punish the ensuing publication of that information based on the defect in a chain?" *Id.* at 484-85 (Sentelle, J., dissenting) (quoted in *Bartnicki v. Vopper*, 532 U.S. 514, 528 (2000)). I would have answered that question in the negative. While I thought the appropriate test to be a strict scrutiny applicable to content-based limitation on the exercise of free speech, *see id.* at 481 (Sentelle, J., dissenting), a proposition ultimately rejected by the Supreme Court in *Bartnicki*, I nonetheless would reach the same conclusion today under tests applicable to "content-neutral law[s] of general applicability." *Bartnicki*, 532 U.S. at 526. Moreover, I would reach such a conclusion with confidence, based on the Supreme Court's decision adjudicating the constitutionality of a similar application of this same statement in *Bartnicki*.

At approximately the same time that our prior decision was making its way to the Supreme Court, the Supreme Court granted *certiorari* in *Bartnicki v. Vopper*, 200 F.3d 109 (3d Cir. 1999), to answer precisely the issue before us in *Boehner*. *See Bartnicki v. Vopper*, 530 U.S. 1260 (2000) (granting *certiorari*). In *Bartnicki*, the Third Circuit had concluded that the application of 18 U.S.C. § 2511(1)(c) to prevent disclosure of information obtained by the disclosing person from a tape of unlawfully intercepted communications was constitutionally "invalid" because it "deterred significantly more speech than necessary to protect the privacy interests at stake." 532 U.S. at 522. The Supreme Court expressly granted *certiorari* "to resolve the conflict," between *Bartnicki* and our decision in *Boehner*. *Id.* The Supreme Court affirmed the decision of the Third Circuit, *id.* at 535, and thereby resolved the conflict in favor of the Third Circuit's decision, not our decision in *Boehner*.

In *Bartnicki*, the chief negotiator for a Union Local, which was then engaged in negotiations on behalf of teachers with a local school board, used a cellular phone to call the president of the Union "and engage in a lengthy conversation about the status of the negotiations." *Id.* at 518. At one point in the conversation, referring to the school board's "intransigence," she said "'we're gonna have to go to their . . . homes . . . [t]o blow off their front porches . . . .'" *Id.* at 518-19. A local radio commentator, respondent in the Supreme Court, broadcast a tape of the conversation on a radio show. All parties agreed that the tape, like the tape of Boehner's conversation released by McDermott, was the result of an unlawful interception. The identity of the interceptor remained undisclosed throughout the litigation. The Union officers, like Boehner in the instant case, sued the publishers of the contents of the tape. In that case, the defendants included the broadcaster, the radio stations over which he made his broadcast, and the person who furnished the broadcaster with the tape, himself the head of a local citizens'

group who testified that he had obtained the tape when it was left anonymously in his mailbox.  Like Boehner in the case before us, plaintiffs relied on section 2511(1)(c) and a state statute of similar import.  The district court granted summary judgment for the plaintiffs, rejecting the defendant's First Amendment defense.  As noted above, the Third Circuit, in a divided opinion, disagreed, reversed the trial court, and remanded with directions to the district court to grant the summary judgment motions of the defendants on the basis of the First Amendment defense.  *Bartnicki*, 200 F.3d at 129.

On *certiorari* the Supreme Court, as had the Third Circuit, ruled that the statute was content neutral and subjected the statute to review under the "intermediate scrutiny" standard.  532 U.S. at 521, 526.  While that standard is less stringent than the one I would have erroneously applied to the case before us, the result was nonetheless the one that I contended should have prevailed in *Boehner*.  That is, the Supreme Court ruled that the statute was unconstitutional as applied.

In addressing the issue, the Supreme Court adopted my formulation:

> Where the punished publisher of information has obtained the information in question in a manner lawful in itself but from a source who has obtained it unlawfully, may the government punish the ensuing publication of that information based on the defect in a chain?

*Id.* at 528 (quoting *Boehner*, 191 F.3d at 484-85) (Sentelle, J., dissenting)).  In analyzing the law on that subject, the Supreme Court first noted that "[a]s a general matter, 'state action to punish the publication of truthful information seldom can satisfy constitutional standards.'"  *Id.* at 527 (quoting *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 102 (1979)).  The Supreme Court

then expressed its continuing belief "that the sensitivity and significance of the interests presented in clashes between [the] First Amendment and privacy rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case." *Id.* at 529 (quoting *Florida Star v. B.J.F.*, 491 U.S. 524, 532-33 (1989)) (alteration in original).  In applying that balance to the facts before it, the Court observed that the United States, appearing in the case to defend the constitutionality of the statute, had identified "two interests served by the statute." *Id*.  The first of those interests was the removal of "an incentive for parties to intercept private conversations," and the second, to "minimiz[e] the harm to persons whose conversations have been illegally intercepted." *Id*.  While the Court was willing to "assume that those interests adequately justify the prohibition in § 2511(1)(d) against the interceptor's own use of information . . . acquired by violating § 2511(1)(a)," the Court explicitly stated that "it by no means follows that punishing disclosures of lawfully obtained information of public interest by one not involved in the initial illegality is an acceptable means of serving those ends." *Id*.

The Court easily dispensed with the first justification, opining that "[t]he normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it." *Id.*  The Court concluded, however, that "it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party." *Id.* at 529-30.  It further noted that "there is no basis for assuming that imposing sanctions" on the communicating possessor of conversations illegally taped by another "will deter the unidentified scanner from continuing to engage in surreptitious interceptions." *Id.* at 531.  Thus, the Court held that "the Government's first suggested justification for applying § 2511(1)(c) to an otherwise innocent disclosure of public information is plainly

insufficient." *Id.* at 532.

However, the Court found the government's second justification, that is, the protection of privacy, "considerably stronger." *Id.* It noted the importance of privacy of communication and the legitimacy of the argument that "fear of public disclosure of private conversations might well have a chilling effect on private speech." *Id.* at 533. Nonetheless, the Court was convinced that the enforcement of section 2511(1)(c) on the facts before it, "implicat[ed] the core purposes of the First Amendment because it imposes sanctions on the publication of truthful information of public concern." *Id.* at 533-34. In concluding that this second interest did not have sufficient strength to warrant the limitation on publication of truthful information of public concern, the Court reiterated the classic principle that "'[t]he right of privacy does not prohibit any publication of matter which is of public or general interest.'" *Id.* at 534 (quoting SAMUEL D. WARREN & LOUIS D. BRANDEIS, *The Right to Privacy*, 4 HARV. L. REV. 193, 214 (1890)).

In the light of the Supreme Court's resolution of the conflict between our *Boehner* decision and the Third Circuit's decision in its *Bartnicki* opinion, there is no justification for us to hold otherwise on the facts before us. There is no distinction of legal let alone constitutional significance between our facts and those before the Court in *Bartnicki*. As the majority admits, "[t]he *Bartnicki* Court held that under the First Amendment, § 2511(1)(c) was invalid as applied to individuals who lawfully obtained a tape of such a conversation and then disclosed it, 532 U.S. at 535." Maj. Op. at 6. That said, the majority is unable to produce a distinction between this case and *Bartnicki*. Granted, the majority states:

The difference between this case and *Bartnicki* is plain to see. It is the difference between someone who discovers a

bag containing a diamond ring on the sidewalk and someone who accepts the same bag from a thief, knowing the ring inside to have been stolen. The former has committed no offense; the latter is guilty of receiving stolen property, even if the ring was intended only as a gift.

Maj. Op. at 13-14 (footnotes omitted). In fact, the difference is not plain at all. In *Bartnicki* the Supreme Court expressly stated:

The suit at hand involves the repeated intentional disclosure of an illegally intercepted cellular telephone conversation about a public issue. The persons who made the disclosures did not participate in the interception, but they did know--or at least had reason to know--that the interception was unlawful.

532 U.S. at 517-18. The majority apparently would make the distinction between the two cases based on an analogy between a person who buys a diamond ring from a thief, and one who obtains a stolen diamond ring knowing it to be stolen or having at least good reason to know that it was stolen. I see no such distinction, let alone a plain one of constitutional significance. The Supreme Court underlined the lack of constitutional significance of the communicator's knowledge that the interception had been unlawfully conducted. It stated that "[w]e accept petitioners' submission that the interception was intentional, and therefore unlawful, and that, at a minimum, respondents 'had reason to know' that it was unlawful." *Id.* at 525. The majority, apparently attempting to shore up its artificial distinction, states:

As Chief Judge Ginsburg wrote in the original appeal: "One who obtains information in an illegal transaction, with full knowledge the transaction is illegal, has not 'lawfully obtain[ed]' that information in any meaningful sense."

Maj. Op. at 13 n.6 (quoting *Boehner*, 191 F.3d at 479 (Ginsburg, J., concurring)) (alteration in original).

The Supreme Court has directly dispelled that notion both in *Bartnicki* itself and previously. The Supreme Court in *Bartnicki* expressly stated, "[respondents'] access to the information on the tapes was obtained lawfully, even though the information itself was intercepted unlawfully by someone else." 532 U.S. at 525. In support of this proposition the court cites and quotes *Florida Star*, which stated "[e]ven assuming the Constitution permitted a State to proscribe *receipt* of information, Florida has not taken this step." 491 U.S. at 536 (emphasis in original). Florida still has not taken that step, nor has Congress. Therefore, the otherwise-lawful receipt of unlawfully obtained information remains in itself lawful, even where the receiver knows or has reason to know that the source has obtained the information unlawfully.

Even less convincing is the majority's assertion that the Court mentioned the anonymity of the interceptor in *Bartnicki* several times and "distinguished this case on that ground." Maj. Op. at 7. The so-called distinguishing of the case occurred in a footnote stating as follows:

> In the *Boehner* case, as in this suit, a conversation over a car cell phone was intercepted, but in that case the defendant knew both who was responsible for intercepting the conversation and how they had done it. In the opinion of the majority [of the D.C. Circuit], the defendant acted unlawfully in accepting the tape in order to provide it to the media.

532 U.S. at 522 n.5 (quoted at Maj. Op. at 7-8) (internal citations omitted). Today's majority hastens to say "[w]e do not want to read too much into the Court's 'but' in the first sentence,

yet one must wonder why the Court drew this distinction if it meant to adopt the rule Representative McDermott urges on us." Maj. Op. at 8. The referenced footnote occurs in the Court's statement of the facts of the case and is never referenced in the legal analysis. Indeed, the footnote is subscribed to a textual sentence stating "[i]n so doing, [the Third Circuit dissenter] agreed with the majority opinion in a similar case decided by the Court of Appeals for the District of Columbia, *Boehner v. McDermott*, 191 F.3d 463 (D.C. Cir. 1999)." 532 U.S. at 522. If the Supreme Court in fact thought that the "distinction" was of constitutional significance, one must wonder why it thought the different results in the two circuit cases constituted a disagreement. This wonderment must be greatly enhanced upon reading the next sentence, which reads "[w]e granted certiorari to resolve the conflict." *Id.* The Supreme Court then goes on to resolve the conflict without making any further mention of any factual difference between the cases. To paraphrase the majority, one must wonder why the Court so easily dispensed with the distinction between one who knows who unlawfully intercepted a conversation and one who knows or has reason to know it was unlawfully intercepted. Indeed, the Supreme Court's disposition of the case lays to rest any distinction even between the one who knows and the one who has reason to know. The Court reversed and remanded, directing entry of judgment for the defense on the constitutional theory. The record before the Court did not establish whether the defendants knew or only had reason to know of the unlawful obtaining of the conversations. If there were any such distinction in the High Court's view, the disposition would have been a vacatur and remand for the lower courts to establish upon which side of the "distinction" their case fell – that is, to determine whether the respondents knew or only had reason to know. As the Court made no such disposition, there is plainly no such distinction of constitutional magnitude.

The Supreme Court having decided the very issue of this case, that is, whether the United States (or Florida) can constitutionally bar the publication of information originally obtained by unlawful interception but otherwise lawfully received by the communicator, my opinion on whether that decision is correct or incorrect matters little. Nonetheless, I will venture to say that an opposite rule would be fraught with danger. Just as Representative McDermott knew that the information had been unlawfully intercepted, so did the newspapers to whom he passed the information. I see no distinction, nor has Representative Boehner suggested one, between the constitutionality of regulating communication of the contents of the tape by McDermott or by *The Washington Post* or *The New York Times* or any other media resource. For that matter, every reader of the information in the newspapers also learned that it had been obtained by unlawful intercept. Under the rule proposed by Representative Boehner, no one in the United States could communicate on this topic of public interest because of the defect in the chain of title. I do not believe the First Amendment permits this interdiction of public information either at the stage of the newspaper-reading public, of the newspaper-publishing communicators, or at the stage of Representative McDermott's disclosure to the news media. Lest someone draw a distinction between the First Amendment rights of the press and the First Amendment speech rights of nonprofessional communicators, I would note that one of the communicators in *Bartnicki* was himself a news commentator, and the Supreme Court placed no reliance on that fact.

In sum, I respectfully dissent.