SENTELLE, Circuit Judge,
dissenting,
with whom Circuit Judges ROGERS, TATEL, and GARLAND join, and with
whom Circuit Judge GRIFFITH
joins as to Part I.
The history of this case is by now quite long, and most of it is set out either in the majority opinion or in one of the previous iterations of the underlying events and the court decisions set forth in prior opinions of this court. See Boehner v. McDermott, 191 F.3d 463 (D.C.Cir.1999) (“Boehner D.C. Cir. I”); Boehner v. McDermott, 441 F.3d 1010 (D.C.Cir.2006) (“Boehner D.C. Cir. II"). Appellee brought the present action, which the district court dismissed, reasoning this application of 18 U.S.C. § 2511(l)(c) violated the First Amendment guarantee to the right of free speech. The defendant appealed. In a split decision, a panel of this court reversed the dismissal, holding that the application of section 2511(l)(c) and a parallel Florida statute “are not unconstitutional as applied in this case.” Boehner D.C. Cir. I, 191 F.3d at 478; see also id. at 480 (Ginsburg, J., concurring). I disagreed with the majority’s opinion then, as I do today. As I perceived the case then, and as we perceive it now, the issue is: “Where the punished publisher of information has ob- *582 tamed the information in question in a manner lawful in itself but from a source who has obtained it unlawfully, may the government punish the ensuing publication of that information based on the defect in a chain?” Id. at 484-85 (Sentelle, J., dissenting) (quoted in Bartnicki v. Vopper, 532 U.S. 514, 528, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001)). We would have answered that question in the negative. Today I reach that conclusion with confidence, based on the Supreme Court’s decision adjudicating the constitutionality of a similar application of this same analysis in Bartnicki.
At approximately the same time that our prior decision was making its way to the Supreme Court, the Court granted certiorari in Bartnicki v. Vopper, 200 F.3d 109 (3d Cir.1999), to answer precisely the issue before us in Boehner. See Bartnicki v. Vopper, 530 U.S. 1260, 120 S.Ct. 2716, 147 L.Ed.2d 981 (2000) (granting certiorari). In Bartnicki, the Third Circuit had concluded that the application of 18 U.S.C. § 2511(l)(c) to prevent disclosure of information obtained by the disclosing person from a tape of unlawfully intercepted communications was constitutionally “invalid” because it “deterred significantly more speech than necessary to protect the privacy interests at stake.” 532 U.S. at 522, 121 S.Ct. 1753. The Supreme Court expressly granted certiorari “to resolve the conflict,” between Bartnicki and our decision in Boehner D.C. Cir. I. Id. The Court affirmed the decision of the Third Circuit, id. at 535, 121 S.Ct. 1753, and thereby resolved the conflict in favor of the Third Circuit’s decision, not our decision in Boeh-ner.
Thereafter, in the wake of Bartnicki, the Supreme Court vacated our prior decision in Boehner D.C. Cir. I and remanded to this court for further consideration in light of Bartnicki. 532 U.S. 1050, 121 S.Ct. 2190, 149 L.Ed.2d 1022 (2001). We remanded the matter to the district court. That court entered a new decision in favor of appellee. Boehner v. McDermott, 332 F.Supp.2d 149 (D.D.C.2004). McDermott then appealed. A panel of this court reheard the matter and affirmed the district court, again over my dissent. Boehner D.C. Cir. II, 441 F.3d 1010. We vacated the panel and set the matter for the present en banc proceeding. On the issue considered by the Supreme Court in Bart-nicki, the position of the dissent in the prior panel opinions now commands a majority of the court so that Section I of this opinion speaks for the court. However, because of the majority decision as to the Bartnicki issue, the court found it necessary to reach a second issue not previously fully considered. As that issue became the rule of decision, and resulted in an affir-mance of the district court; and as a majority of the court has now decided to affirm the district court on the basis of the second issue, discussed in Section II of this separate opinion, that portion of this opinion will speak only for a dissenting minority of the court.
I.
As to the issue dealt with in the prior opinions, speaking now for a majority of the court, we determine that Bartnicki is controlling and that the Bartnicki reasoning of the Supreme Court compels a conclusion that the district court incorrectly concluded that Bartnicki does not apply.
In Bartnicki, the chief negotiator for a Union Local, which was then engaged in negotiations on behalf of teachers with a local school board, used a cellular phone to call the president of the Union “and engage in a lengthy conversation about the status of the negotiations.” 532 U.S. at 518, 121 S.Ct. 1753. At one point in the conversation, referring to the school *583 board’s “intransigence,” she said “ ‘we’re gonna have to go to their ... homes ... [t]o blow off their front porches ....’” Id. at 518-19, 121 S.Ct. 1753. A local radio commentator, respondent in the Supreme Court, broadcast a tape of the conversation on a radio show. All parties agreed that the tape, like the tape of Boehner’s conversation released by McDermott, was the result of an unlawful interception. The identity of the interceptor remained undisclosed throughout the litigation. The Union officers, like Boehner in the instant case, sued the publishers of the contents of the tape. The defendants included the broadcaster, the radio stations over which he made his broadcast, and the person who furnished the broadcaster with the tape, himself the head of a local citizens’ group who testified that he had obtained the tape when it was left anonymously in his mailbox. Like Boehner in the case before us, plaintiffs relied on section 2511(l)(c) and a state statute of similar import. The district court granted summary judgment for the plaintiffs, rejecting the defendants’ First Amendment defense. As noted above, the Third Circuit, in a divided opinion, disagreed, reversed the trial court, and remanded with directions to the district court to grant the summary judgment motions of the defendants on the basis of the First Amendment defense. Bartnicki, 200 F.3d at 129.
On certiorari the Supreme Court, as had the Third Circuit, ruled that the statute was content neutral and subjected the statute to review under the “intermediate scrutiny” standard. 532 U.S. at 521, 526, 121 S.Ct. 1753. Applying that standard, the Supreme Court held that the statute was unconstitutional as applied.
In addressing the issue, the Supreme Court adopted my formulation:
Where the punished publisher of information has obtained the information in question in a manner lawful in itself but from a source who has obtained it unlawfully, may the government punish the ensuing publication of that information based on the defect in a chain?
Id. at 528, 121 S.Ct. 1753 (quoting Boehner D.C. Cir. I, 191 F.3d at 484-85) (internal quotation marks omitted) (Sentelle, J., dissenting). In analyzing the law on that subject, the Supreme Court first noted that “[a]s a general matter, ‘state action to punish the publication of truthful information seldom can satisfy constitutional standards.’ ” Id. at 527, 121 S.Ct. 1753 (quoting Smith v. Daily Mail Publ’g Co., 443 U.S. 97, 102, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979)). The Supreme Court then expressed its continuing belief “that the sensitivity and significance of the interests presented in clashes between [the] First Amendment and privacy rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case.” Id. at 529, 121 S.Ct. 1753 (quoting Florida Star v. B.J.F., 491 U.S. 524, 532-33, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989)) (alteration in original). In applying that balance to the facts before it, the Court observed that the United States, appearing in the case to defend the constitutionality of the statute, had identified “two interests served by the statute.” Id. The first of those interests was the removal of “an incentive for parties to intercept private conversations,” and the second, to “minimiz[e] the harm to persons whose conversations have been illegally intercepted.” Id. While the Court was willing to “assume that those interests adequately justify the prohibition in § 2511(l)(d) against the interceptor’s own use of information ... acquired by violating § 2511(l)(a),” the Court explicitly stated that “it by no means follows that punishing disclosures of lawfully obtained information of public interest by one not involved in the initial illegality is an ac *584 ceptable means of serving those ends.” Id.
The Court easily dispensed with the first justification, opining that “[t]he normal method of deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it.” Id. The Court concluded, however, that “it would be quite remarkable to hold that speech by a law-abiding possessor of information can be suppressed in order to deter conduct by a non-law-abiding third party.” Id. at 529-30, 109 S.Ct. 2603. It further noted that “there is no basis for assuming that imposing sanctions” on the communicating possessor of conversations illegally taped by another “will deter the unidentified scanner from continuing to engage in surreptitious interceptions.” Id. at 531, 109 S.Ct. 2603. Thus, the Court held that “the Government’s first suggested justification for applying § 2511(l)(e) to an otherwise innocent disclosure of public information is plainly insufficient.” Id. at 532, 109 S.Ct. 2603.
However, the Court found the government’s second justification, that is, the protection of privacy, “considerably stronger.” Id. It noted the importance of privacy of communication and the legitimacy of the argument that “fear of public disclosure of private conversations might well have a chilling effect on private speech.” Id. at 533, 109 S.Ct. 2603. Nonetheless, the Court was convinced that the enforcement of section 2511(l)(c) on the facts before it, “implicat[ed] the core purposes of the First Amendment because it imposes sanctions on the publication of truthful information of public concern.” Id. at 533-34, 109 S.Ct. 2603. In concluding that this second interest did not have sufficient strength to warrant the limitation on publication of truthful information of public concern, the Court reiterated the classic principle that “ ‘[t]he right of privacy does not prohibit any publication of matter which is of public or general interest.’ ” Id. at 534, 109 S.Ct. 2603 (quoting Samuel D. Warren & Louis D. Brandeis, The Right to Privacy, 4 Haev. L. Rev. 193, 214 (1890)).
In the light of the Supreme Court’s resolution of the conflict between our Boehner decision and the Third Circuit’s decision in Bartnicki, there is no justification for us to hold otherwise on the facts before us. There is no distinction of legal, let alone constitutional, significance between our facts and those before the Court in Bart-nicki. As the panel majority in Boehner D.C. Cir. II admitted, “[t]he Bartnicki Court held that under the First Amendment, § 2511(l)(c) was invalid as applied to individuals who lawfully obtained a tape of such a conversation and then disclosed it.” 441 F.3d at 1013. That said, appellee is unable to produce a material distinction between this case and Bartnicki. Granted, the panel majority stated:
The difference between this case and Bartnicki is plain to see. It is the difference between someone who discovers a bag containing a diamond ring on the sidewalk and someone who accepts the same bag from a thief, knowing the ring inside to have been stolen. The former has committed no offense; the latter is guilty of receiving stolen property, even if the ring was intended only as a gift.
Id. at 1017 (footnote omitted). In fact, the difference is not plain at all. In Bartnicki the Supreme Court expressly stated:
The suit at hand involves the repeated intentional disclosure of an illegally intercepted cellular telephone conversation about a public issue. The persons who made the disclosures did not participate in the interception, but they did know — or at least had reason to know— that the interception was unlawful.
532 U.S. at 517-18, 121 S.Ct. 1753. The panel majority apparently made a distinc *585 tion between the two cases based on an analogy between a person who buys a diamond ring from a thief, and one who obtains a stolen diamond ring knowing it to be stolen or having at least good reason to know that it was stolen. We see no such distinction, let alone a plain one of constitutional significance. The Supreme Court underlined the lack of constitutional significance of the communicator’s knowledge that the interception had been unlawfully conducted. It stated that “[w]e accept petitioners’ submission that the interception was intentional, and therefore unlawful, and that, at a minimum, respondents ‘had reason to know that it was unlawful.” Id at 525, 121 S.Ct. 1753. The panel majority, apparently attempting to shore up its distinction, stated:
As Chief Judge Ginsburg wrote in the original appeal: “One who obtains information in an illegal transaction, with full knowledge the transaction is illegal, has not ‘lawfully obtain[ed]’ that information in any meaningful sense.”
Boehner D.C. Cir. II, 441 F.3d at 1017 n. 6 (quoting Boehner D.C. Cir. I, 191 F.3d at 479 (Ginsburg, J., concurring)) (alteration in original).
The Supreme Court has directly dispelled that notion both in Bartnicki itself and previously. The Court in Bartnicki expressly stated, “[respondents’] access to the information on the tapes was obtained lawfully, even though the information itself was intercepted unlawfully by someone else.” 532 U.S. at 525, 121 S.Ct. 1753. In support of this proposition the court cited and quoted Florida Star, which stated “[e]ven assuming the Constitution permitted a State to proscribe receipt of information, Florida has not taken this step.” 491 U.S. at 536, 109 S.Ct. 2603 (emphasis in original). Florida still has not taken that step, nor has Congress. Therefore, the otherwise-lawful receipt of unlawfully obtained information remains in itself lawful, even where the receiver knows or has reason to know that the source has obtained the information unlawfully.
Even less convincing is the Boehner D.C. Cir. II panel majority’s assertion that the Court mentioned the anonymity of the interceptor in Bartnicki several times and “distinguished this case on that ground.” 441 F.3d at 1015. The asserted distinguishing of this case occurred in a footnote stating as follows:
In the Boehner case, as in this suit, a conversation over a car cell phone was intercepted, but in that case the defendant knew both who was responsible for intercepting the conversation and how they had done it. In the opinion of the majority [of the D.C. Circuit], the defendant acted unlawfully in accepting the tape in order to provide it to the media.
532 U.S. at 522 n. 5, 121 S.Ct. 1753 (quoted at 441 F.3d at 1014) (internal citations omitted). The panel majority hastened to say “[w]e do not want to read too much into the Court’s ‘but’ in the first sentence, yet one must wonder why the Court drew this distinction if it meant to adopt the rule Representative McDermott urges on us.” 441 F.3d at 1014. The referenced footnote occurs in the Court’s statement of the facts of the case and is never referenced in the legal analysis. Indeed, the footnote is subscribed to a textual sentence stating “[i]n so doing, [the Third Circuit dissenter] agreed with the majority opinion in a similar case decided by the Court of Appeals for the District of Columbia, Boehner v. McDermott, 191 F.3d 463 (D.C.Cir.1999).” 532 U.S. at 522, 121 S.Ct. 1753. If the Supreme Court in fact thought that the “distinction” was of constitutional significance, one must wonder why it thought the different results in the two circuit cases constituted a disagreement. This wonderment must be greatly enhanced upon read *586 ing the next sentence, which states, “[w]e granted certiorari to resolve the conflict.” Id. The Supreme Court then goes on to resolve the conflict without making any further mention of any factual difference between the cases. To paraphrase the Boehner D.C. Cir. II panel majority, one must wonder why the Court so easily dispensed with the distinction between one who knows who unlawfully intercepted a conversation and one who knows or has reason to know it was unlawfully intercepted. Indeed, the Supreme Court’s disposition of the case lays to rest any distinction even between the one who knows and the one who has reason to know. The Court reversed and remanded, directing entry of judgment for the defense on the constitutional theory. The record before the Court did not establish whether the defendants knew or only had reason to know of the unlawful obtaining of the conversations. If there were any such distinction in the High Court’s view, the disposition would have been a vacatur and remand for the lower courts to establish upon which side of the “distinction” their case fell— that is, to determine whether the respondents knew or only had reason to know. As the Court made no such disposition, there is plainly no such distinction of constitutional magnitude.
The Supreme Court has decided the first issue of this case, that is, whether the United States (or Florida) can constitutionally bar the publication of information originally obtained by unlawful interception but otherwise lawfully received by the communicator, in the negative. We venture to say that an opposite rule would be fraught with danger. Just as Representative McDermott knew that the information had been unlawfully intercepted, so did the newspapers to whom he passed the information. Representative Boehner has suggested no distinction between the constitutionality of regulating communication of the contents of the tape by McDermott or by The Washington Post or The New York Times or any other media resource. For that matter, every reader of the information in the newspapers also learned that it had been obtained by unlawful intercept. Under the rule proposed by Representative Boehner, no one in the United States could communicate on this topic of public interest because of the defect in the chain of title. We do not believe the First Amendment permits this interdiction of public information either at the stage of the newspaper-reading public, of the newspaper-publishing communicators, or at the stage of Representative McDermott’s disclosure to the news media. Lest someone draw a distinction between the First Amendment rights of the press and the First Amendment speech rights of nonprofessional communicators, we would note that one of the communicators in Bart-nicki was himself a news commentator, and the Supreme Court placed no reliance on that fact.
Therefore, as to the first issue, we now determine that the district court decision in favor of Boehner was incorrect as to this issue.
II.
A.
Notwithstanding the majority’s view that the district court was incorrect as to the Bartnicki issue, the en banc court now holds that the judgment in favor of Boeh-ner will be upheld on a ground different than that relied upon by the district court, arising from an issue not addressed in the previous majority opinions of this court. Boehner’s argument, accepted as the basis of the majority’s holding that the district court should be affirmed, is that McDer-mott’s speech was not entitled to the First Amendment protection recognized in Bart- *587 nicki and the cases upon which it relies, but not because the First Amendment provides no protection against the imposition of liability under 18 U.S.C. § 2511(l)(c) to the receiver of information unlawfully obtained by the transferor of the information. Rather, Boehner argues, the protections of the First Amendment are not available in an action under § 2511(l)(c) to a public official whose First Amendment rights are otherwise limited by a body of rules unrelated to that statute. More specifically, Boehner advances an argument, which the majority accepts, that starts from the undisputed factual proposition that McDermott, as a member of the Ethics Committee of the United States House of Representatives, was subject to Committee Rule 9. That rule stated that “Committee members and staff shall not disclose any evidence relating to an investigation to any person or organization outside the Committee unless authorized by the Committee.” Boehner reasons, and the majority now agrees, that because McDermott’s speech was otherwise limited in this fashion by the rules, he was not afforded the First Amendment protection recognized in Bartnicki against liability for disclosure under the wiretap statutes of the United States and Florida. I find this reasoning to be a non sequitur.
The majority relies on such cases as Zacchini v. Scripps-Howard Broad. Co., 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977), for the proposition that the Supreme Court has sustained restrictions on disclosure of information even though the information was lawfully obtained. Maj. Op. at 578. It is true that in Zacchini the Supreme Court recognized the right of a performer to recover for the economic loss caused by the uncompensated broadcast of his performance under the state law tort of infringement of the performer’s “right of publicity.” By no means, though, did the Court in Zacchini hold that its conclusion that the First Amendment did not protect the broadcaster against that cause of action deprived it of First Amendment protection in all circumstances and under all theories of law related to its possible broadcast of performances. Indeed, the Zacchini Court expressly stated:
It is evident, and there is no claim here to the contrary, that petitioner’s state-law right of publicity would not serve to prevent respondent from reporting the newsworthy facts about petitioner’s act.
433 U.S. at 574, 97 S.Ct. 2849 (footnote omitted). As Justice Powell noted in dissent,
The holding today is summed up in one sentence: “Wherever the line in particular situations is to be drawn between media reports that are protected and those that are not, we are quite sure that the First and Fourteenth Amendments do not immunize the media when they broadcast a performer’s entire act without his consent.”
Id. at 579, 97 S.Ct. 2849 (Powell, J., dissenting) (quoting id. at 574-75, 97 S.Ct. 2849). Indeed, the Zacchini Court was at pains to note that “[pjetitioner does not seek to enjoin the broadcast of his performance; he simply wants to be paid for it.” Id. at 578, 97 S.Ct. 2849.
In short, Zacchini is not analogous to the case at bar. It would perhaps be analogous were we passing on the authority of the congressional committee to enforce its rule against McDermott in the face of a First Amendment claim, but that is not our case.
Likewise, the majority’s reliance on Cohen v. Cowles Media Co., 501 U.S. 663, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991), is misplaced. That case holds no more than that a person with whom a newspaper has made a contract not to publish certain information may recover damages when *588 the defendant has breached that contract. The opinion in Cohen, while short and narrow, nonetheless distinguishes a contract claim from, for example, an action for libel or defamation:
Nor is Cohen attempting to use a promissory estoppel cause of action to avoid the strict requirements for establishing a libel or defamation claim.... Cohen could not sue for defamation because the information disclosed [his name] was true.
Id. at 671, 111 S.Ct. 2513 (internal citations and punctuation omitted). Thus, the Court expressly distinguished the Cohen facts from Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), wherein the Court had “held that the constitutional libel standards apply to a claim alleging that the publication of a parody was a state-law tort of intentional infliction of emotional distress.” Cohen, 501 U.S. at 671, 111 S.Ct. 2513.
Again, the Cohen Court by no means held that the recognition of one limitation on First Amendment protection of a particular communication rendered the First Amendment inapplicable to that communication for other purposes. Just so today. It may well be that the Committee’s rule constitutes a valid limitation on McDer-mott’s speech. For reasons set forth below, that is by no means clear to me. It is clear that even if that is the case, the rule cannot deprive the speech of all First Amendment protection.
The majority further relies on Seattle Times Co. v. Rhinehart, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). That case stands for nothing more than the proposition that
where a protective order is entered on a showing of good cause as required by Rule 26(c), is limited to the context of pretrial civil discovery, and does not restrict the dissemination of the information if gained from other sources, it does not offend the First Amendment.
Id. at 37, 104 S.Ct. 2199 (footnote omitted). That holding simply has no application to the case before us.
Finally, the majority places strongest reliance on United States v. Aguilar, 515 U.S. 593, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995), a case it describes as “closely analogous to this one.” Maj. Op. at 578. I can do little to improve on the majority’s description of that case, which upheld the restriction of the disclosure of a confidential wiretap as applied to a federal district judge. Like the other cases discussed above, that holding is not on point for the issue before us. First, although it is true that the Court relied in part on the “special duties of nondisclosure” associated with Aguilar’s position as a federal judge, the Court also stressed the fact that the statute at issue there did “not impose such a restriction [on disclosure] generally, but only upon those who disclose wiretap information ‘in order to obstruct, impede, or prevent’ the interception.” United States v. Aguilar, 515 U.S. 593, 605, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995) (quoting 18 U.S.C. § 2232(c) (current version at 18 U.S.C. § 2511(l)(c))), so at least one ground of the Aguilar decision has no application here. Second, we are not charged today with deciding the validity of the restriction placed on McDermott’s speech by the House Committee rule. If we were, then perhaps this would be an analogous case governed by Aguilar. The statute at issue in Aguilar was closely connected with the “special duty of nondisclosure” that limited the defendant’s First Amendment rights. The Supreme Court concluded that a “Federal District Court Judge who learned of a confidential wiretap application from the judge who had authorized the interception, and who wished to preserve the integrity of the *589 court,” Aguilar, 515 U.S. at 606, 115 S.Ct. 2357, had no First Amendment defense against a statute prohibiting “the disclosure of information that a wiretap has been sought or authorized,” id. at 602, 115 S.Ct. 2357. It does not follow that Representative McDermott’s violation of a House Committee rule deprives him of a First Amendment defense to every other nondisclosure law, including § 2511(c) — which in this case is unrelated to whatever “special duty of nondisclosure” McDermott may have had as a member of Congress. Rather, we are charged with determining the constitutionality of applying § 2511 in circumstances directly paralleling those considered by the Supreme Court in Bart-nicki. The Court in Bartnicki upheld the constitutional protection of the possessor of information originally obtained through an unlawful eavesdropping by another. Aguilar in no way speaks to that question.
Again, were we considering the validity of the Committee’s rule as applied to McDermott’s conduct, the cases relied upon by the majority would be instructive — perhaps compelling. But we are not. If the House Committee rules created a private right of action — a most dubious possibility — those cases would be instructive. But neither of those theories is before us. We are reviewing a case governed by Bartnicki, and Bartnicki’s holding should prevail. Under that holding, we should reverse the decision of the district court and order this case dismissed.
B.
I note that the district court declined to apply Aguilar on the theory that “it is outside the realm of the courts to construe Congressional rules that present significant ambiguities.” Boehner v. McDermott, 332 F.Supp.2d 149, 162 (D.D.C.2004). I fully agree. As the district court noted, United States v. Rostenkowski, 59 F.3d 1291 (D.C.Cir.1995), “permits [the courts] to take limited judicial cognizance of the [Ethics Committee Rules].” Boehner v. McDermott, 332 F.Supp.2d 149, 162 (D.D.C.2004). However, as the district court further noted, Rostenkowski also “makes clear that it is outside the realm of the courts to construe Congressional rules that present significant ambiguities.” Id. (citing 59 F.3d at 1312). Again, I fully agree. The Rostenkowski Court correctly stated, as the district court noted, that the courts “cannot presume to interpret [the rule]” of a House of Congress when that rule contains ambiguity. See id. We must leave for the coordinate branch of government the interpretation of its own rules. Committee Rule 9 states that “Committee members and staff shall not disclose any evidence relating to an investigation to any person or organization outside the Committee unless authorized by the Committee.” See Maj. Op. at 579. From the face of the rale, it is hardly unambiguous that the rule forbids disclosure of information obtained by a member — such as McDermott — from private citizens such as the Martins. The tape in question had never become the possession of the Committee, although the Martins may well have intended that it do so. Nor is it by any means pellucid that the tape was “evidence related to an investigation” within the meaning of the rule at the time the Martins turned it over to McDermott. The release by McDermott was not in violation of an unambiguous rule.
Neither can I subscribe to the majority’s confidence that the Ethics Committee’s Report on McDermott’s conduct removes all ambiguity. As the majority notes, the Committee ruled only that “his disclosure ... was inconsistent with the spirit of the applicable rules and represented a failure on his part to meet his obligations as Ranking Minority Member of the House *590 Select Committee on Ethics.” See Maj. Op. at 580. The very incorporation of the phrase “inconsistent with the spirit of the applicable rules” would seem to defeat a claim that the Committee had determined that the rules unambiguously applied to his conduct.
To the extent the court holds that Representative McDermott forfeited his First Amendment protection either by conducting himself inconsistently with the “spirit” of Rule 9 or by violating the terms of House Rule 23 — which states that “[a] Member ... shall adhere to the spirit and the letter of the Rules of the House and to the rules of duly constituted committees thereof’ — its holding suffers from a separate defect. Abrogating Representative McDermott’s First Amendment protections because he violated the “spirit” of a rule contravenes the well-established principle that vague restrictions on speech are impermissible because of their chilling effect, see Reno v. ACLU, 521 U.S. 844, 871-72, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), and because of “the need to eliminate the impermissible risk of discriminatory enforcement,” Gentile v. State Bar of Nevada, 501 U.S. 1030, 1051, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991). Plainly, subjecting a Member of Congress to liability for violating the “spirit” of a rule burdens political speech in the vaguest of ways, leaving the Member to “guess at [the] contours” of the prohibition. Id. at 1048. Nothing in Aguilar countenances such a result.
For the reasons set forth above, I respectfully dissent.